COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                        NO.
2-08-308-CV

 

 

IN THE INTEREST OF K.N.M., A CHILD                                                    

 

 

 

                                              ------------

 

            FROM THE 367TH
DISTRICT COURT OF DENTON COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------








This case involves the attempted withdrawal of
consent to a rule 11 settlement agreement in a custody case before entry of a
final order.  In three issues, appellant
Martha,[2]
the child=s mother, challenges the
propriety of the order incorporating the settlement agreement; she contends in
a fourth issue that the order is not in strict compliance with the settlement
agreement.  We affirm.

                                        Background
Facts

Martha filed a suit affecting the parent-child
relationship (SAPCR) in November 2006 seeking to be named a parent joint
managing conservator of her daughter Karen, along with Karen=s father
Peter.  Peter and Martha have never been
married.  Martha later amended her
petition to seek sole managing conservatorship of Karen.  Martha and Peter subsequently entered into
agreed temporary orders appointing them joint managing conservators, with
Martha having the exclusive right to designate Karen=s
residence within Texas.








The trial court referred the case to mediation on
September 27, 2007.  The next day,
Daphne, Martha=s mother, filed a petition in
intervention, seeking to be named Karen=s sole
managing conservator and in the alternative to have possession of and access to
Karen.  She alleged that she had standing
because Athe
child=s
present environment presents a serious question concerning the child=s
physical health or welfare.@  See Tex. Fam. Code Ann. _ 102.004(a)(1) (Vernon
2008) (providing that a grandparent may file an original suit requesting
managing conservatorship if there is satisfactory proof to the court that Athe
order requested is necessary because the child=s
present circumstances would significantly impair the child=s
physical health or emotional development@).  In an affidavit attached to her petition in
intervention, Daphne alleged that she had had significant contact with Karen
since her birth, seeing her every weekend and a few nights during the week.  She also alleged that Karen and Martha had
moved in with her for several months when Karen was almost two years old and
that she had provided significant financial support.

Daphne further alleged that the summer Karen was
three years old, Martha and Peter broke up for good, and Martha and Karen moved
in with her for two months.  She took
care of Karen because Karen and Martha had a Aterrible
relationship@; Daphne alleged that Martha and
Karen would scream at each other and that Martha did not want to be a mother to
Karen.  Eventually, Peter began to take
Karen three nights a week, Daphne would have her two or three days a week, and
Martha or Martha=s father would have Karen one or
two days a week.  Daphne alleged that
between August 2005 and March 2006 Martha would spend her nights in the bars
and her days sleeping, leaving Karen to be watched by her grandfather or placed
in daycare.








Daphne further alleged that Martha eventually
began dating the man who would become her husband, got a day job, and stopped
allowing Daphne to see Karen as much. 
Karen would call Daphne screaming that she wanted to see her and would
scream in hysterics when Martha came to pick her up.  Daphne further alleged that Martha eventually
moved to Dallas[3]
and began to restrict Daphne=s access
to Karen, including obtaining temporary orders in the SAPCR precluding Peter
from allowing Karen to stay with or visit Daphne for more than a four hour
period during his periods of possession. 
Daphne alleges that in November 2006, about the time Martha filed the
SAPCR, Martha told Daphne that she Acould
not ever see [Karen] again.@  According to Daphne, Karen would cry and beg
Peter to let her see Daphne. 

Daphne=s
affidavit alleges that Martha continued to threaten that Daphne would never see
Karen again, calling her one time Ain a
drunken rage.@ 
She also alleged that Martha told Karen that Daphne did not love Martha
and thus could not be a part of Karen=s
family; this upset Karen.  Daphne averred
that Karen told her that Martha locks her in her room at night so that she will
not get up.  She also accused Martha of
drinking and taking Xanax and stated that A[w]ith
the exception of the two year period of time when she was pregnant with [Karen]
and the first year and a half after, [Martha] has taken many drugs while
[Karen] was in her care.@ 
According to Daphne, Martha uses the television and computer to
entertain Karen and Ahas no interaction with [her] at
all.@ 








Daphne concluded her affidavit by averring that
if Karen were kept from her, it would break the bond between the two of them,
detrimentally affecting Karen.  According
to Daphne, she has

been the only stable
person in [Karen=s] life since birth.  [Her] home has been the only place [Karen]
felt totally safe.  She loves her father
and has a bond with him, but even he has not been the person she depends on.  Because of all the turmoil in her little
life, to remove [Daphne] from [Karen=s] life would change her forever.

 

A mediation occurred on October 24, 2007, but no
settlement was reached.  It is unclear
which parties participated in the mediation. 
In January 2008, Daphne filed a petition in intervention for grandparent
possession or access, alleging that A[d]enial
of possession or access . . . will significantly impair [Karen=s]
physical health or emotional well-being@ and
that she has had a Asignificant past relationship@ with
Karen since her birth.  See id.
' 102.004(b).








Neither party objected to the petitions in
intervention or filed a motion to strike. 
Instead, on March 31, 2008, at the final hearing set for the case,
Martha, Peter, and Daphne all testified that they had reached an agreement for
Martha and Peter to be named joint managing conservators of Karen with Martha
having the primary right to determine Karen=s
residence and incorporating the standard possession order for parents living
more than 100 miles apart.  In addition, Daphne
would be granted four consecutive days=
visitation with Karen during the summer: 
two days during Peter=s
possession and two days during Martha=s
possession.  They additionally agreed
that if any conservator was to have Karen stay overnight in someone else=s care
that Aeveryone
[was] to be notified of that.@  Peter was to pay child support and health
care insurance for Karen, and uninsured medical expenses were to be split
50/50.  Further, Martha was to have the
right to make decisions regarding Karen=s
education.  All parties agreed on the
record that Daphne would be responsible for making sure Karen was picked up and
delivered safely to and from the respective parents=
residences before and after Daphne exercised her visitation and that if the
parties wanted to provide Daphne Awith
more time outside of her four consecutive days that they [would be] free to do
that.@

After the parties finished putting their
settlement agreement on the record, the trial court stated, 

All right.  Somebody=s going to prepare an order which reflects
this.  Is that correct?

 

. . . .

 

All right.  Then based upon the
testimony of all the parties involved, the court will approve the agreements as
they have been stated for the record, and I will make it the written
order of the court when it is submitted. 
[Emphasis added.]

 








A draft order was not immediately presented to the trial court.[4]

Thereafter, on May 28, 2008, Martha filed a ANotice
of Withdrawal of Consent to Oral Agreement.@  In it, she purported to withdraw her consent
to the settlement agreement because of Daphne=s Acontinued
lack of communication and cooperation, for more than a year, with@ Martha;
Daphne=s not
having Karen overnight for more than a year; Martha=s
feeling Apressured
into@
entering the agreement; and Martha=s better
understanding of Troxel v. Granville, 530 U.S. 57 (2000). 

Thereafter, Daphne filed a AMotion
to Enter Final Order,@ asking the trial court to enter
a written order reflecting the settlement agreement and attaching a form
order.  The motion states that it is
Daphne=s way to
enforce the rule 11 settlement agreement. 
Martha responded, citing Padilla v. LaFrance and contending that
she had withdrawn her consent before the trial court rendered judgment.  907 S.W.2d 454 (Tex. 1995).  She also requested a jury trial.  Daphne objected to Martha=s
attempt to withdraw her consent to the settlement agreement. 








The trial court held a hearing on Daphne=s motion
to enter a final order, during which Peter agreed with Daphne that Martha could
not withdraw her consent to the agreement because the trial court approved the Aagreement
here in the court, and that is on the record.@  However, Martha and Peter also argued that
they had agreed to certain terms that were not included in the rule 11
agreement, but they never stated what those terms are.  At the end of the hearing, the trial court
stated,

I agree the order should have been entered.  But it wasn=t.  And I don=t have any problem giving y=all some additional time
before the dismissal docket to try to reach an agreed order. . . .

 

. . . [L]ooking at the record of this, it says - - it does say the
court will approve the agreements and I will make it the written order of the
court when it is submitted.  That=s not like rendering a
judgment as of that date.  And, you know,
I think the law is that they can withdraw it before [a] final order is entered.

 

. . . [I]f you have a specific case that you want to refer me to that
I can look at more carefully to support your position, obviously I want to
follow the case law as closely and carefully as possible, and I=ll be happy to review
anything that you want me to review.  But
that=s my understanding of the
law, especially if there are still issues that are unresolved.  And just looking back through here, it does
appear to me that there were some loose ends as stated on the record. 

 

The trial court did not rule on the motion, however; instead, it gave
Daphne the opportunity to file a bench brief in support of her position, which
she did. 








Despite the trial court=s
comments at the end of the hearing, the trial court subsequently signed an
order dated July 16, 2008, naming Martha and Peter joint managing conservators,
incorporating the standard possession order for parents living more than 100
miles apart, providing for Daphne to have possession of Karen for two
consecutive days of her choice during Peter=s summer
possession and two consecutive days of her choice during Martha=s summer
possession, ordering Peter and Martha to surrender Karen to Daphne at their
respective residences, and ordering Daphne to return Karen to Peter=s and
Martha=s
respective residences.  The order also
provided that if Karen would be staying in someone else=s care
overnight during one parent=s time
of possession and access, that parent should notify the other parent.  It also incorporated the child support
provisions agreed to by Martha and Peter. 
The order requires Peter to provide health insurance for Karen and
requires Martha and Peter to each pay fifty percent of any uninsured expenses.

Martha filed a motion for new trial, which the
trial court denied after a hearing. 

                                              Standing

In her first issue, Martha
contends that the trial court abused its discretion by allowing Daphne to
maintain the suit when she failed to plead facts or submit any evidence
supporting her alleged standing under chapter 102 of the family code.[5]








Daphne alleged standing under family code section
102.004, subsections (a) and (b).  Tex.
Fam. Code Ann. ' 102.004(a)B(b).  A party meeting the standards of section
102.004(a) has standing to file an original SAPCR, whereas a party must meet
only the more relaxed requirements of section 102.004(b) to intervene in a
pending SAPCR.  Id.; see In re
N.L.G., 238 S.W.3d 828, 830 (Tex. App.CFort
Worth 2007, no pet.); Whitworth v. Whitworth, 222 S.W.3d 616, 621 (Tex.
App.CHouston
[1st Dist.] 2007, no pet.).  Under
section 102.004(b), a grandparent may intervene in a pending SAPCR if the
grandparent has had substantial past contact with the child and appointment of
one or both parents as managing conservators would significantly impair the
child=s
physical health or emotional development. 
Tex. Fam. Code Ann. ' 102.004(b);
In re M.J.G., 248 S.W.3d 753, 757 (Tex. App.CFort
Worth 2008, no pet.).  Here, because
there is no evidentiary record on standing, we review the standing issue by
construing the pleadings in favor of the petitioner and looking to the pleader=s
intent.  See In re A.M.S., 277
S.W.3d 92, 95 & n.3 (Tex. App.CTexarkana
2009, no pet.); M.J.G., 248 S.W.3d at 757.








Here, Daphne averred in an affidavit attached to
her first petition that her past contact with Karen included seeing her
regularly on weekends and a few nights during the week.  She also averred that Karen and Martha had
lived with her for several months beginning when Karen was almost two.  Martha did not begin restricting Daphne=s access
to Karen until after she had started dating her fiancé, now husband.  In addition, Daphne alleged that Peter had
attempted to allow Daphne access during the pendency of this suit even though
Daphne is Martha=s mother, not Peter=s.  We conclude and hold that, construing the
pleadings in the light most favorable to Daphne, Daphne alleged sufficient
facts to support the conclusion that she had had substantial past contact with
Karen.  See Villarreal v. Villarreal,
No. 14-04-00071-CV, 2005 WL 3116218, at *2 (Tex. App.CHouston
[14th Dist.] Nov. 23, 2005, no pet.) (mem. op.).








Daphne also alleged that Martha had taken drugs
in the past in and out of Karen=s
presence.  She also alleged that Martha=s
withholding access was causing emotional trauma to Karen.  She averred that she was the only stable
person in Karen=s life and that Martha was still
drinking and taking Xanax.  She also
alleged that Martha uses the television and computer to entertain Karen and
that she has no interaction with Karen at all. 
Based on the foregoing, we conclude and hold that Daphne sufficiently
alleged that appointing Martha as a managing conservator would significantly
impair Karen=s physical health or emotional
development.  Cf. Kushner v. Kushner,
No. 03-06-00634-CV, 2008 WL 615422, at *1B3 (Tex.
App.CAustin
Mar. 7, 2008, no pet.) (mem. op.) (holding that trial court did not abuse its
discretion by denying motion to strike under section 102.004(b) when
grandfather=s petition alleged that mother
was an alcoholic, had been intoxicated when caring for child, had exposed child
to violent boyfriend, had lied during proceedings, and had child removed once
by CPS).

Accordingly, we conclude and hold that Daphne
alleged sufficient facts to show standing to intervene under section
102.004(b).  We overrule Martha=s first
issue.

                                       Rule
11 Agreement       

In her third issue, Martha contends that the
trial court abused its discretion by entering an order incorporating the
parties= rule 11
agreement because she validly withdrew her consent before the trial court
rendered a final order.








A rule 11 settlement agreement is not binding if
a party withdraws its consent before the trial court has rendered judgment
unless the other party successfully sues to enforce the settlement agreement as
a contract.  See Padilla,
907 S.W.2d at 461B62; Brooks v. Brooks, 257
S.W.3d 418, 421B22 (Tex. App.CFort
Worth 2008, pet. denied); see also Tex. Civ. Prac. & Rem. Code Ann. '
154.071(a) (Vernon 2005) (regarding settlement agreements entered into after
mediation).[6]  Once the trial court renders judgment based
on a rule 11 settlement agreement, the parties cannot revoke their consent to
the agreement.  Alcantar v. Okla. Nat=l Bank, 47
S.W.3d 815, 821 (Tex. App.CFort
Worth 2001, no pet.).

Judgment is Arendered@ when
the trial court officially announces its decision on the matter submitted to it
in open court or by written memorandum filed with the clerk.  S & A Rest. Corp. v. Leal, 892
S.W.2d 855, 857 (Tex. 1995); Cook v. Cook, 243 S.W.3d 800, 801 (Tex.
App.CFort
Worth 2007, no pet.); Alcantar, 47 S.W.3d at 821.[7]








The rendition of the trial court=s
decision, whether in open court or by official document of the court, is the
critical moment when the judgment becomes effective.  The subsequent reduction of the rendered
judgment to writing is typically carried out by the party favored by the
judgment.  The signature of the trial
court upon the writing is merely a ministerial act of the court conforming to
the provision of Rule 306a(2) of the Texas Rules of Civil Procedure which calls
for Aall
judgments, decisions and orders of any kind to be reduced to writing and signed
by the trial judge with the date of signing stated therein.@  The trial judge=s
signature upon the written judgment does not affect or change the date of the
rendition of the judgment.  A judgment is
Aentered@ when it
is recorded in the minutes of the trial court by a purely ministerial act of
the trial court=s clerk, thereby providing
enduring evidence of the judicial act.

Henry v. Cullum Cos., 891 S.W.2d 789, 792 (Tex.
App.CAmarillo
1995, writ denied) (citations omitted) (cited in Alcantar, 47 S.W.3d at
821 nn.28B29).  Thus, the date a trial court signs a judgment
controls subsequent new trial and appellate deadlines rather than determines
when a judgment is rendered.  Alcantar,
47 S.W.3d at 821; Henry, 891 S.W.2d at 792.








An intent to render judgment in the future does
not equal rendition, however.  S &
A Rest. Corp., 892 S.W.2d at 858; Cook, 243 S.W.3d at 801.  The words spoken or written by the trial
court must evince a present act that effectively decides the issues before the
court.  S & A Rest. Corp., 892
S.W.2d at 858; Cook, 243 S.W.3d at 801. 
In other words, the trial court=s words
must Aclearly
indicate the intent to render judgment at the time the words are expressed.@  S & A Rest. Corp., 892 S.W.2d at
858.  But what the trial court believes
to be the legal effect of its act is not dispositive.  Id. (AThe fact
that the trial court believed that he had rendered judgment during the May 14
hearing is not dispositive.@).[8]








Here, the issues to be resolved by the trial
court were conservatorship, child support, and other issues related to an
original SAPCR, as well as Daphne=s
intervention seeking conservatorship or possession and access.  The case was set for a final hearing the day
the parties were questioned about and agreed to the settlement on the record in
court.  No issues were left open for
resolution, and the trial court=s
language at the end of the hearingCAupon the
testimony of all the parties involved, the court will approve the agreements as
they have been stated for the record, and I will make it the written order of
the court when it is submitted@Cindicates
a present intent to orally render judgment on the parties=
agreement and an intent to sign a Awritten@
memorialization of the present order at a later date.  See Patel v. Eagle Pass Pediatric Health
Clinic, Inc., 985 S.W.2d 249, 251B52 (Tex.
App.CCorpus
Christi 1999, no pet.) (holding the following words showed a present intent to
orally render judgment, ASettlement is approved and
ordered.  Mr. Rhodes, . . . you draft the
order, circulate it, and let=s have
it within five working days.@); Arriaga
v. Cavazos, 880 S.W.2d 830, 832B33 (Tex.
App.CSan
Antonio 1994, no writ) (holding the following sufficient to show present intent
to orally render judgment:  A[T]he court
will order $4,259 payable no later than ten days.@).

Our conclusion is further supported by the trial
court=s docket
sheet entry for that day:  AFinal
Hearing - Parties appeared w/ attys & testified; All matters agreed - Ct.
approved agreements; Order to be presented.@  See Tex. Fam. Code Ann. ' 101.026
(Vernon 2008); Henry, 891 S.W.2d at 793.








The facts in this case, including the actual
words spoken by the trial court, distinguish it from Cook, 243 S.W.3d at
801B02, in
which a majority of the panel held that the trial court did not indicate a
present intent to render judgment when it stated that A[u]pon
submission of the final decree and signed by the Court, the divorce will be
granted at that time, not today.@  But see Cook, 243 S.W.3d at 805
(Livingston, J., dissenting) (urging that trial court=s
approval of settlement agreement as Ajust and
right@ and
statement that Aagreement   . . . is approved@ had
legal effect of granting divorce).  Here,
the trial court clearly distinguished between its oral rendition at the hearing
and the need for a written memorialization of that order, stating, AI will
make it the written order of the court when it is submitted.@  [Emphasis added.]

Accordingly, we conclude and hold that the trial
court rendered a final order in the case on March 31, 2008 in open court, and,
therefore, Martha did not timely withdraw her consent to the rule 11 settlement
agreement.  We overrule Martha=s third
issue.

In her second issue, Martha contends that the
trial court abused its discretion by signing a final order giving Daphne a
superior right of possession to Karen without proper pleadings or evidence
under chapter 153, denying Martha her Fourteenth Amendment due process
rights.  She specifically cites sections
153.002, 153.432, and 153.433 of the family code.[9]








To the extent that Martha=s
argument in her second issue is contingent on her contention that she validly
withdrew her consent to the rule 11 agreement, we overrule her second issue for
the reasons set forth above.  To the
extent that Martha=s argument is based on her
contention that Daphne did not overcome the chapter 153 presumption that a
parent acts in his or her child=s best
interest, permitting a grandparent to obtain court‑ordered access only
upon a showing that denial of access will Asignificantly
impair the child=s physical health or emotional
well‑being,@ we hold that the issue was
resolved by the settlement agreement.  See
Tex. Fam. Code Ann. '' 153.007, 153.433
(Vernon 2008); In re Derzapf, 219 S.W.3d 327, 333 (Tex. 2007) (orig.
proceeding).








The public policy of the State of Texas is that
the best interest of the child is the primary consideration of the court in
determining conservatorship issues.  Tex.
Fam. Code Ann. ' 153.002 (Vernon 2008); Garcia-Udall
v. Udall, 141 S.W.3d 323, 331 (Tex. App.CDallas
2004, no pet.); see In re C.A.P., Jr., 233 S.W.3d 896, 902 (Tex. App.CFort
Worth 2007, no pet.).  An agreement on
conservatorship issues that is not in the child=s best
interest violates public policy and is unenforceable.  Garcia-Udall, 141 S.W.3d at 331
(citing Leonard v. Lane, 821 S.W.2d 275, 278 (Tex. App.CHouston
[1st Dist.] 1991, writ denied); Hill v. Hill, 819 S.W.2d 570, 572 (Tex.
App.CDallas
1991, writ denied)).

The trial court specifically found that 

possession of the Child by [Daphne] is in the
best interest of the Child because as all parties involved, through their own
free will and after being questioned by their respective attorneys in open
court, created a Rule 11 Agreement in the presence of the Court by testifying
that it was their desire to allow such possession because they felt it would be
in the best interest of the Child.  Said
possession was not created nor forced upon the parties; rather, the Court
accepted their testimony that the possession was in the best interest of the
Child and concurred with their decision. 








Martha does not challenge this finding; thus, it is binding on us
unless the contrary is established as a matter of law or there is no evidence
to support the finding.  See
McGalliard v. Kuhlmann, 722 S.W.2d 694, 696 (Tex. 1986); Raman Chandler
Props., L.C. v. Caldwell=s Creek
Homeowners Ass=n, 178
S.W.3d 384, 390 (Tex. App.CFort
Worth 2005, pet. denied).  Considering
the parties= agreement and the policies set
out in the family code, Martha has not made such a showing.  We conclude and hold that the trial court did
not abuse its discretion by approving the parties=
settlement agreement and thus granting Daphne the possession and access agreed
to by the parties.  See Tex. Fam.
Code Ann. ' 153.007(a)B(b)
(providing that parties may amicably settle conservatorship and possession
disputes by agreement and that trial court shall render order accordingly if
agreement is in child=s best interest).  We overrule her second issue.

                   Conformance of Final Order
to Rule 11 Agreement

In her fourth issue, Martha
complains that the final order is incomplete and does not strictly conform to
the parties= agreement.  When parties reach a settlement agreement,
the judgment must conform to that agreement. 
Chisholm v. Chisholm, 209 S.W.3d 96, 98 (Tex. 2006); Vickrey
v. Am. Youth Camps, Inc., 532 S.W.2d 292, 292 (Tex. 1976); Tinney v.
Willingham, 897 S.W.2d 543, 544 (Tex. App.CFort
Worth 1995, no writ).  Martha contends
that the final order does not conform to the settlement agreement in numerous
ways; we will examine each one in turn.

Daphne=s Attorney








Martha says that the final order reflects the
wrong attorney for Daphne.  But the
attorney listed is the one who actually represented her at the March 31 hearing
during which the parties testified to their settlement agreement, although her counsel
has since changed.  The inclusion of this
attorney=s name
lends further support to our conclusion that the trial court rendered judgment
orally on that date as that attorney was the one who argued at the Afinal
hearing@ rather
than the subsequent motion to enforce hearing. 
Additionally, the presence of her attorney=s name
as of March 31, 2008 in the order accurately reflects her representation as of
that date as shown in the record.[10]  Martha also claims that the order
inaccurately reflects that a jury was waived; however, at the time the order
was rendered, the parties had waived a jury by entering into the agreed
settlement and allowing the trial court to render judgment.[11]  See Solares v. Solares, 232 S.W.3d
873, 882 (Tex. App.CDallas 2007, no pet.); Massey
v. Galvan, 822 S.W.2d 309, 318 (Tex. App.CHouston
[14th Dist.] 1992, writ denied).  Thus,
we conclude that the final order is not nonconforming in these respects.

Agreed Parenting Plan

Martha contends that A[t]he
Parenting Plan [referenced on page 2 of the order] was not agreed to by the
parties on the Record or otherwise.@  This is in reference to the following
statement in the order:  AThe
Court finds that the provisions in these orders relating to conservatorship,
possession of and access to the child, child support, and a dispute resolution
process to minimize future disputes constitute the parties= agreed
parenting plan.@








Family code section 153.007 provides that the
parties to a dispute regarding conservatorship, or possession and access, or
both, may amicably settle their disputes by entering into an agreed parenting
plan, subject to the trial court=s
approval after considering the child=s best
interest.  Tex. Fam. Code Ann. ' 153.007;
Lane v. Hart, 651 S.W.2d 419, 421 (Tex. App.CEastland
1983, writ ref=d n.r.e.) (holding that oral
agreement qualifies as agreed parenting plan under former version of section
153.007); see McLendon v. McLendon, 847 S.W.2d 601, 608 (Tex. App.CDallas
1992, writ denied) (noting that rule 11 itself Aequates
a written agreement with the >open
court and entered of record= portion
of [the] rule@).  Here, the parties entered into a rule 11
settlement agreement on the record, disposing of all the conservatorship,
possession, and access issues, which the trial court approved, finding that it
was in Karen=s best interest.  Accordingly, we conclude and hold that this
statement in the final order is in conformance with the parties=
agreement and comports with section 153.007. 
See Tex. Fam. Code Ann. ' 153.007(a),
(b).

Child=s Residence Limited to Texas

Martha contends that the following was not agreed
to, on the record or otherwise:








The Court finds that, in
accordance with section 153.001 of the Texas Family Code, it is the public
policy of Texas to assure that children will have frequent and continuing
contact with conservators who have shown the ability to act in the best
interest of the child, to provide a safe, stable, and nonviolent environment
for the child, and to encourage conservators to share in the rights and duties
of raising the child.  IT IS ORDERED that
the primary residence of the child shall be the state of Texas, and the parties
shall not remove the child from the state of Texas for the purpose of changing
the primary residence of the child until modified by further order of the court
of continuing jurisdiction or by written agreement signed by the parties and
filed with the court.

 

It is unclear which part of this statement Martha challenges.  However, as to the second sentence regarding
residency, Peter agreed on the record that Martha would have the primary right
to determine Karen=s residence Awithin
the state of Texas,@ and
Martha testified that she agreed with Aeverything
that=s been
said.@  [Emphasis added.]  As to the first sentence, it merely restates
the public policy of the State as to conservatorship issues and does not
mention possession and access by nonconservators, such as Daphne is here.  As such, it is difficult to ascertain how it
conflicts with the parties=
agreement at trial or how it could have caused an improper judgment.  See Tex. R. App. P. 44.1(a)(1).  We conclude and hold that this provision does
not conflict with or impermissibly add to the parties=
agreement.[12]








Conservators Living 100 Miles or Less Apart

Martha contends that the parties did not agree on
the standard possession schedule for parties living 100 miles or less
apart.  We agree.  Peter testified that the parties agreed that
Peter will have standard possession for parents living over a hundred miles
apart.  Although both schedules are
included in the order, the schedule for parents living less than 100 miles
apart specifically says that it does not apply when Peter lives more than 100
miles away.  It is undisputed that Peter
lives in Houston, and Martha lives in the Metroplex area.  Accordingly, we conclude and hold that this
provision conforms to the parties=
agreement.

Daphne=s Possession

Martha claims that the parties never agreed that
Daphne would have a superior right of possession to Karen, that she was to
surrender Karen at either Peter=s or
Martha=s house,
depending on whose period of possession it was, or that Daphne was to have
exclusive periods of possession.

The part of the order giving Daphne possession
states as follows:

[Daphne] shall have a
superior right of possession of the child as follows:

 








1.     Summer Possession by
[Daphne] - [Daphne] shall have possession of the child for a period of two
consecutive days of her choice during [Peter=s] summer possession and a period of two
consecutive days of her choice during [Martha=s] summer possession,
totaling a period of four days each year . . . .

 

2.     Surrender of Child by
[Martha] and [Peter] - [Martha] and [Peter] are ORDERED to surrender the child
to [Daphne] at the beginning of each period of [Daphne=s] possession at their
residence.

 

[3].   Return of Child by [Daphne] - [Daphne] is ORDERED to return the
child to [Peter] and/or [Martha], if [Peter] or [Peter[13]]
are entitled to possession of the child, at the end of each of [Daphne=s]
exclusive periods of possession, at their residence. 








Peter testified that the parties agreed that
Daphne would Aexercise two of [his] 42 days in
the summer for the purpose of her having a little bit of visitation@ and
that Martha would Abe surrendering two of her days.@  When asked if she understood that Daphne
would Abe
exercising possession, two of those days coming out of [Martha=s]
summer possession and two days coming out of [Peter=s]
summer possession,@ Martha answered, AYes.@  Thus, Peter and Martha each agreed that they
would surrender two of their days of possession to Daphne so that Daphne could
exercise Apossession@ of
Karen.  A person with rights to Apossession
of@ a child
may exercise possession and control of the child, to the exclusion of all other
persons including the managing conservator, during periods of possession.  E.C., Jr. ex rel. Gonzales v. Graydon,
28 S.W.3d 825, 831 (Tex. App.CCorpus
Christi 2000, no pet.); Hopkins v. Hopkins, 853 S.W.2d 134, 137 (Tex.
App.CCorpus
Christi 1993, no writ).  Moreover, the
parties specifically agreed that Daphne would be allowed additional access
during either parent=s period of possession if that
parent so consented.

Although there was some confusion at first as to
whether Daphne would be allowed to travel with Karen by airplane, Daphne
eventually testified that she understood that she would pick up and return
Karen to the residence of the parent who was surrendering his or her period of
possession.  When Peter=s
counsel asked Daphne if she understood that she was Aresponsible
for picking up [Karen] at - - in Flower Mound and dropping her off there as
well,@ Martha=s
counsel interjected, AOr wherever she is.@  He did not object to the questions or Daphne=s subsequent
testimony that she was Afine with that,@ and it
is clear on the record that the parties had agreed on this arrangement as well.

We conclude and hold that this part of the final
order conforms with the parties=
agreement.

General Terms and Conditions








Martha contends that the parties did not agree to
the AGeneral
Terms and Conditions,@ which state that they apply to
possession regardless of the distance between the parties A[e]xcept
as otherwise explicitly provided in this Standard Possession Order.@  But these conditions are statutorily-
required parts of the standard possession order regardless of distance, and the
parties agreed to the standard possession order for parents living more than
100 miles apart.  See Tex. Fam.
Code Ann. ' 153.316 (Vernon 2008); In
re Lester, 254 S.W.3d 663, 664 n.1 (Tex. App.CBeaumont
2008, orig. proceeding).  Therefore, this
provision does not conflict with the parties=
agreement.

Health Care Provisions

Martha contends that the parties did not agree to
the health care provisions on pages 18B26 of
the final order.  Our review of the order
indicates that it contains the agreement that Peter testified to and Martha
agreed with:  that Peter would provide
Karen=s health
care insurance and that any uninsured expenses would be split 50/50 between
Peter and Martha.  Martha does not
explain how the provisions differ from the parties=
agreement.  See Tex. R. App. P.
38.1(i); Shelton v. Sargent, 144 S.W.3d 113, 119 (Tex. App.CFort
Worth 2004, pet. denied); see also Haynes v. Haynes, 180 S.W.3d 927, 930
(Tex. App.CDallas 2006, no pet.)
(explaining that provisions not explicitly agreed to in settlement agreement
but that have the effect of carrying out the essential terms agreed upon do not
impermissibly vary or add to settlement agreement).








Miscellaneous Child Support Provisions

Martha additionally challenges the miscellaneous
child support provisions as conflicting. 
The child support provisions incorporate the statutory provisions of
family code sections 154.006, 154.013, and 154.015 regarding the status of
child support obligations upon an obligor=s or
obligee=s death
and upon marriage of the conservators. 
Tex. Fam. Code Ann. ' ' 154.006,
154.013, 154.015 (Vernon 2008).  Nowhere
in the parties= agreement do they purport to
change the family code=s provisions regarding child
support obligations; rather, Peter testified that he was paying current child
support of $165 per month and working down an arrearage of $100 per month, both
of which he paid directly to the state disbursement unit, and that he wanted
the court to suspend withholding because he was self-employed.  Accordingly, we conclude and hold that the
provisions of the final order incorporating the family code=s
requirements concerning termination and/or continuation of child support do not
conflict with the parties= agreement.[14]








Medical Notification Provisions

Martha further contends that the provision (1)
requiring the parents to give each other notice if Karen requires surgical
intervention or hospitalization or both, (2) requiring them to sign any
necessary HIPAA releases, and (3) requiring each of them to designate the other
as a person to whom protected health care information may be disclosed is in
conflict with the parties= agreement.  Martha fails to explain how this provision
fails to effectuate the parties=
agreement regarding their joint managing conservatorship or Karen=s best
interest.  See Tex. Fam. Code Ann.
' 153.001(a)(3)
(Vernon 2008) (providing that state=s public
policy is to Aencourage parents to share in
the rights and duties of raising their child after the parents have separated@); Haynes,
180 S.W.3d at 930.  Thus, we conclude and
hold that this provision does not impermissibly conflict with the rule 11
settlement agreement.

Discharge from Discovery Retention Requirements








Finally, Martha complains that the parties did
not agree to the provision discharging them from retaining discovery under rule
191.4, which allows the trial court to so order.  Tex. R. Civ. P. 191.4.  We fail to see how this provision
impermissibly alters or adds to the parties=
agreement, especially considering that Martha has not raised any
discovery-related issues on appeal.  See
Haynes, 180 S.W.3d at 930.

Miscellaneous

Martha also includes argument in her brief that
Peter=s
weekends of possession were changed from the second, fourth, and fifth
weekends, as set forth in the agreed temporary orders, to the first, third, and
fifth weekends as set forth in the standard possession order.  See Tex. Fam. Code Ann. ' 153.313
(Vernon 2008).  However, Peter and Martha
both specifically agreed to the standard possession order on the record; thus,
the trial court did not err by rendering an order entitling Peter to possession
on the first, third, and fifth weekends rather than the second, fourth, and
fifth.  See id.; Alcantar,
47 S.W.3d at 821.








Martha further complains that the order does not
include provisions for Daphne to give any specified prior notice before
exercising her possession.  Because the
parties did not agree on any such provision, we cannot conclude that the trial
court abused its discretion by failing to include such a provision in the final
order.  We do note, however, that the
entire tone of the trial court=s orderCas well
as the provisions of the family codeCurges
and promotes cooperation between the parties and the amicable settlement of any
disputes, with the paramount interest being the best interest of the child in
the conduct of all affairs; Daphne=s
voluntarily providing prior notice, although not required, would certainly be
in keeping with the spirit of the final order incorporating the parties=
agreement.  We overrule Martha=s fourth
issue.

                                             Conclusion

Having overruled Martha=s four
issues, we affirm the trial court=s final
order.

 

TERRIE
LIVINGSTON

JUSTICE

 

PANEL:  LIVINGSTON, DAUPHINOT,
and WALKER, JJ.

DELIVERED:  July 23, 2009











[1]See Tex. R. App. P. 47.4.





[2]For purposes of
maintaining the confidentiality of this appeal, we will refer to all parties by
fictitious names.  See Tex. R.
App. P. 9.8; Tex. Fam. Code Ann. ' 109.002(d) (Vernon 2008).





[3]Peter and Daphne live in
the Houston area.





[4]The parties appear to
agree that Martha=s counsel was to be
responsible for preparing the order.





[5]Because standing involves
subject matter jurisdiction, we address the issue on appeal even though Martha
failed to file a motion to strike the intervention in the trial court.  See Whitworth v. Whitworth, 222 S.W.3d
616, 621 (Tex. App.CHouston [1st Dist.] 2007,
no pet.); In re Pringle, 862 S.W.2d 722, 724 (Tex. App.CTyler 1993, no writ).





[6]This was not a mediated
settlement agreement under either section 6.602 or section 153.0071(c)B(e-1) of the family
code.  See Tex. Fam. Code Ann. ' 6.602 (Vernon
2006), ' 153.0071(c)B(e-1) (Vernon 2008).





[7]A judgment routinely goes
through three stages:  rendition,
reduction to writing and judicial signing, and entry.  In re Bill Heard Chevrolet, Ltd., 209
S.W.3d 311, 314 n.5 (Tex. App.CHouston [1st Dist.] 2006, orig. proceeding); Wittau
v. Storie, 145 S.W.3d 732, 735 (Tex. App.CFort Worth 2004, no
pet.); Henry v. Cullum Cos., 891 S.W.2d 789, 792 (Tex. App.CAmarillo 1995, writ
denied).





[8]In S & A Rest.
Corp., the trial court had asked the plaintiff whether she realized that
once the judgment had been signed and the trial court approved it, then, at
that point, everything was Afull, final and complete@ and she could not Acome back later and say, >Well I made a mistake,= or >We should have gone for
more.=@  Id. at 857.  Even though the trial court stated in the
motion for new trial hearing, AI approved the settlement.  I also rendered [j]udgment,@ the supreme court held
that what the trial court believed was not dispositive because that belief was
not reflected in the trial court=s spoken words. 
Id. at 858.  But see
Escobar v. Escobar, 711 S.W.2d 230, 232 (Tex. 1986) (holding, in deciding
whether judgment nunc pro tunc was proper, that Awhether the court
pronounced judgment orally and the terms of the pronouncement are questions of
fact@); Hernandez v. Lopez, No. 01-06-00901-CV, 2009
WL 793635, at *4 (Tex. App.CHouston [1st Dist.] 2009, no pet.) (op. on reh=g) (same).  Thus, it appears that the trial court, in
making findings of fact regarding whether it rendered judgment orally, and if
so what the terms of that judgment are, must rely solely on what the record
reflects the trial court did and said, rather than the trial court=s independent
recollection of those facts.  See S
& A Rest. Corp., 892 S.W.2d at 858; Escobar, 711 S.W.2d at 232; Hernandez,
2009 WL 793635, at *4.





[9]Section 153.002 states
that the trial court shall always make the child=s best interest its
primary consideration in determining issues of conservatorship and access.  Tex. Fam. Code Ann. ' 153.002 (Vernon
2008).  Section 153.432 authorizes a
grandparent to file either an original or modification suit for possession of
or access to a grandchild, and section 153.433 requires the trial court
to order grandparent access if the grandparent Aovercomes the presumption
that a parent acts in the best interest of the parent=s child by proving by a
preponderance of the evidence that denial of possession of or access to the
child would significantly impair the child=s physical health or emotional well‑being.@  Id. '' 153.432, 153.433.





[10]Moreover, even if the
order did not accurately reflect Daphne=s attorney=s name, such an error would be clerical rather
than judicial.  See McLendon v.
McLendon, 847 S.W.2d 601, 610 (Tex. App.CDallas 1992, writ denied).





[11]Martha did not request a
jury until after she attempted to withdraw her consent to the settlement
agreement.





[12]Martha also contends that
the order erroneously states that Peter lives out of state, but this is simply
a misreading of the language, which states that the geographical restriction
will be lifted if, at any time Martha wants to move out of state, Peter is then
living out of state.





[13]This should reference
Martha and is clearly a typo based on the rest of the sentence.  Although invited to do so by the trial court,
Martha declined to file a motion asking the trial court to correct any
nonjudicial errors in the final order.  See
McLendon, 847 S.W.2d at 610.





[14]Daphne concedes that the
paragraph ANo Credit for Informal
Payments@ is not included in any
statutory provision.  This paragraph
requires Peter to pay child support in the manner required by the final order
and does not give him credit for payment made directly to Martha or for money
spent on Karen during his periods of possession.  Not only does this provision not conflict
with Peter=s testimony that he paid
child support directly to the state disbursement unit, it also has not been
challenged by Peter and is clearly in Karen=s best interest and to the benefit of
Martha.  Accordingly, we conclude and
hold that that portion of the order is likewise not in conflict with the
parties= agreement.  See Haynes, 180 S.W.3d at 930.