

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 2-08-308-CV

IN THE INTEREST OF K.N.M., A CHILD

------------

FROM THE 367TH DISTRICT COURT OF DENTON COUNTY

------------

## MEMORANDUM OPINION[1]

------------

This case involves the attempted withdrawal of consent to a rule 11 settlement agreement in a custody case before entry of a final order. In three issues, appellant Martha,[2] the child's mother, challenges the propriety of the order incorporating the settlement agreement; she contends in a fourth issue

---

[1] *See* Tex. R. App. P. 47.4.

[2] For purposes of maintaining the confidentiality of this appeal, we will refer to all parties by fictitious names. *See* Tex. R. App. P. 9.8; Tex. Fam. Code Ann. § 109.002(d) (Vernon 2008).

that the order is not in strict compliance with the settlement agreement. We affirm.

**Background Facts**

Martha filed a suit affecting the parent-child relationship (SAPCR) in November 2006 seeking to be named a parent joint managing conservator of her daughter Karen, along with Karen's father Peter. Peter and Martha have never been married. Martha later amended her petition to seek sole managing conservatorship of Karen. Martha and Peter subsequently entered into agreed temporary orders appointing them joint managing conservators, with Martha having the exclusive right to designate Karen's residence within Texas.

The trial court referred the case to mediation on September 27, 2007. The next day, Daphne, Martha's mother, filed a petition in intervention, seeking to be named Karen's sole managing conservator and in the alternative to have possession of and access to Karen. She alleged that she had standing because "the child's present environment presents a serious question concerning the child's physical health or welfare." *See* Tex. Fam. Code Ann. § 102.004(a)(1) (Vernon 2008) (providing that a grandparent may file an original suit requesting managing conservatorship if there is satisfactory proof to the court that "the order requested is necessary because the child's present circumstances would significantly impair the child's physical health or emotional development"). In

2

an affidavit attached to her petition in intervention, Daphne alleged that she had had significant contact with Karen since her birth, seeing her every weekend and a few nights during the week. She also alleged that Karen and Martha had moved in with her for several months when Karen was almost two years old and that she had provided significant financial support.

Daphne further alleged that the summer Karen was three years old, Martha and Peter broke up for good, and Martha and Karen moved in with her for two months. She took care of Karen because Karen and Martha had a "terrible relationship"; Daphne alleged that Martha and Karen would scream at each other and that Martha did not want to be a mother to Karen. Eventually, Peter began to take Karen three nights a week, Daphne would have her two or three days a week, and Martha or Martha's father would have Karen one or two days a week. Daphne alleged that between August 2005 and March 2006 Martha would spend her nights in the bars and her days sleeping, leaving Karen to be watched by her grandfather or placed in daycare.

Daphne further alleged that Martha eventually began dating the man who would become her husband, got a day job, and stopped allowing Daphne to see Karen as much. Karen would call Daphne screaming that she wanted to see her and would scream in hysterics when Martha came to pick her up. Daphne

3

further alleged that Martha eventually moved to Dallas[3] and began to restrict Daphne's access to Karen, including obtaining temporary orders in the SAPCR precluding Peter from allowing Karen to stay with or visit Daphne for more than a four hour period during his periods of possession. Daphne alleges that in November 2006, about the time Martha filed the SAPCR, Martha told Daphne that she "could not ever see [Karen] again." According to Daphne, Karen would cry and beg Peter to let her see Daphne.

Daphne's affidavit alleges that Martha continued to threaten that Daphne would never see Karen again, calling her one time "in a drunken rage." She also alleged that Martha told Karen that Daphne did not love Martha and thus could not be a part of Karen's family; this upset Karen. Daphne averred that Karen told her that Martha locks her in her room at night so that she will not get up. She also accused Martha of drinking and taking Xanax and stated that "[w]ith the exception of the two year period of time when she was pregnant with [Karen] and the first year and a half after, [Martha] has taken many drugs while [Karen] was in her care." According to Daphne, Martha uses the television and computer to entertain Karen and "has no interaction with [her] at all."

---

[3] Peter and Daphne live in the Houston area.

Daphne concluded her affidavit by averring that if Karen were kept from her, it would break the bond between the two of them, detrimentally affecting Karen. According to Daphne, she has

> been the only stable person in [Karen's] life since birth. [Her] home has been the only place [Karen] felt totally safe. She loves her father and has a bond with him, but even he has not been the person she depends on. Because of all the turmoil in her little life, to remove [Daphne] from [Karen's] life would change her forever.

A mediation occurred on October 24, 2007, but no settlement was reached. It is unclear which parties participated in the mediation. In January 2008, Daphne filed a petition in intervention for grandparent possession or access, alleging that "[d]enial of possession or access . . . will significantly impair [Karen's] physical health or emotional well-being" and that she has had a "significant past relationship" with Karen since her birth. *See id*. § 102.004(b).

Neither party objected to the petitions in intervention or filed a motion to strike. Instead, on March 31, 2008, at the final hearing set for the case, Martha, Peter, and Daphne all testified that they had reached an agreement for Martha and Peter to be named joint managing conservators of Karen with Martha having the primary right to determine Karen's residence and incorporating the standard possession order for parents living more than 100 miles apart. In addition, Daphne would be granted four consecutive days'

5

visitation with Karen during the summer: two days during Peter's possession and two days during Martha's possession. They additionally agreed that if any conservator was to have Karen stay overnight in someone else's care that "everyone [was] to be notified of that." Peter was to pay child support and health care insurance for Karen, and uninsured medical expenses were to be split 50/50. Further, Martha was to have the right to make decisions regarding Karen's education. All parties agreed on the record that Daphne would be responsible for making sure Karen was picked up and delivered safely to and from the respective parents' residences before and after Daphne exercised her visitation and that if the parties wanted to provide Daphne "with more time outside of her four consecutive days that they [would be] free to do that."

After the parties finished putting their settlement agreement on the record, the trial court stated,

> All right. Somebody's going to prepare an order which reflects this. Is that correct?
>
> . . . .
>
> All right. Then based upon the testimony of all the parties involved, the court will approve the agreements as they have been stated for the record, and I will make it the *written* order of the court when it is submitted. [Emphasis added.]

6

A draft order was not immediately presented to the trial court.[4]

Thereafter, on May 28, 2008, Martha filed a "Notice of Withdrawal of Consent to Oral Agreement." In it, she purported to withdraw her consent to the settlement agreement because of Daphne's "continued lack of communication and cooperation, for more than a year, with" Martha; Daphne's not having Karen overnight for more than a year; Martha's feeling "pressured into" entering the agreement; and Martha's better understanding of *Troxel v. Granville*, 530 U.S. 57 (2000).

Thereafter, Daphne filed a "Motion to Enter Final Order," asking the trial court to enter a written order reflecting the settlement agreement and attaching a form order. The motion states that it is Daphne's way to enforce the rule 11 settlement agreement. Martha responded, citing *Padilla v. LaFrance* and contending that she had withdrawn her consent before the trial court rendered judgment. 907 S.W.2d 454 (Tex. 1995). She also requested a jury trial. Daphne objected to Martha's attempt to withdraw her consent to the settlement agreement.

The trial court held a hearing on Daphne's motion to enter a final order, during which Peter agreed with Daphne that Martha could not withdraw her

---

[4] The parties appear to agree that Martha's counsel was to be responsible for preparing the order.

7

consent to the agreement because the trial court approved the "agreement here in the court, and that is on the record." However, Martha and Peter also argued that they had agreed to certain terms that were not included in the rule 11 agreement, but they never stated what those terms are. At the end of the hearing, the trial court stated,

> I agree the order should have been entered. But it wasn't. And I don't have any problem giving y'all some additional time before the dismissal docket to try to reach an agreed order. . . .
>
> . . . [L]ooking at the record of this, it says - - it does say the court will approve the agreements and I will make it the written order of the court when it is submitted. That's not like rendering a judgment as of that date. And, you know, I think the law is that they can withdraw it before [a] final order is entered.
>
> . . . [I]f you have a specific case that you want to refer me to that I can look at more carefully to support your position, obviously I want to follow the case law as closely and carefully as possible, and I'll be happy to review anything that you want me to review. But that's my understanding of the law, especially if there are still issues that are unresolved. And just looking back through here, it does appear to me that there were some loose ends as stated on the record.

The trial court did not rule on the motion, however; instead, it gave Daphne the opportunity to file a bench brief in support of her position, which she did.

Despite the trial court's comments at the end of the hearing, the trial court subsequently signed an order dated July 16, 2008, naming Martha and Peter joint managing conservators, incorporating the standard possession order

for parents living more than 100 miles apart, providing for Daphne to have possession of Karen for two consecutive days of her choice during Peter's summer possession and two consecutive days of her choice during Martha's summer possession, ordering Peter and Martha to surrender Karen to Daphne at their respective residences, and ordering Daphne to return Karen to Peter's and Martha's respective residences. The order also provided that if Karen would be staying in someone else's care overnight during one parent's time of possession and access, that parent should notify the other parent. It also incorporated the child support provisions agreed to by Martha and Peter. The order requires Peter to provide health insurance for Karen and requires Martha and Peter to each pay fifty percent of any uninsured expenses.

Martha filed a motion for new trial, which the trial court denied after a hearing.

### Standing

In her first issue, Martha contends that the trial court abused its discretion by allowing Daphne to maintain the suit when she failed to plead facts or submit any evidence supporting her alleged standing under chapter 102 of the family code.[5]

---

[5] Because standing involves subject matter jurisdiction, we address the issue on appeal even though Martha failed to file a motion to strike the

9

Daphne alleged standing under family code section 102.004, subsections (a) and (b). Tex. Fam. Code Ann. § 102.004(a)–(b). A party meeting the standards of section 102.004(a) has standing to file an original SAPCR, whereas a party must meet only the more relaxed requirements of section 102.004(b) to intervene in a pending SAPCR. *Id.*; *see In re N.L.G.*, 238 S.W.3d 828, 830 (Tex. App.—Fort Worth 2007, no pet.); *Whitworth v. Whitworth*, 222 S.W.3d 616, 621 (Tex. App.—Houston [1st Dist.] 2007, no pet.). Under section 102.004(b), a grandparent may intervene in a pending SAPCR if the grandparent has had substantial past contact with the child and appointment of one or both parents as managing conservators would significantly impair the child's physical health or emotional development. Tex. Fam. Code Ann. § 102.004(b); *In re M.J.G.*, 248 S.W.3d 753, 757 (Tex. App.—Fort Worth 2008, no pet.). Here, because there is no evidentiary record on standing, we review the standing issue by construing the pleadings in favor of the petitioner and looking to the pleader's intent. *See In re A.M.S.*, 277 S.W.3d 92, 95 & n.3 (Tex. App.—Texarkana 2009, no pet.); *M.J.G.*, 248 S.W.3d at 757.

---

intervention in the trial court. *See Whitworth v. Whitworth*, 222 S.W.3d 616, 621 (Tex. App.—Houston [1st Dist.] 2007, no pet.); *In re Pringle*, 862 S.W.2d 722, 724 (Tex. App.—Tyler 1993, no writ).

Here, Daphne averred in an affidavit attached to her first petition that her past contact with Karen included seeing her regularly on weekends and a few nights during the week. She also averred that Karen and Martha had lived with her for several months beginning when Karen was almost two. Martha did not begin restricting Daphne's access to Karen until after she had started dating her fiancé, now husband. In addition, Daphne alleged that Peter had attempted to allow Daphne access during the pendency of this suit even though Daphne is Martha's mother, not Peter's. We conclude and hold that, construing the pleadings in the light most favorable to Daphne, Daphne alleged sufficient facts to support the conclusion that she had had substantial past contact with Karen. *See Villarreal v. Villarreal*, No. 14-04-00071-CV, 2005 WL 3116218, at *2 (Tex. App.—Houston [14th Dist.] Nov. 23, 2005, no pet.) (mem. op.).

Daphne also alleged that Martha had taken drugs in the past in and out of Karen's presence. She also alleged that Martha's withholding access was causing emotional trauma to Karen. She averred that she was the only stable person in Karen's life and that Martha was still drinking and taking Xanax. She also alleged that Martha uses the television and computer to entertain Karen and that she has no interaction with Karen at all. Based on the foregoing, we conclude and hold that Daphne sufficiently alleged that appointing Martha as a managing conservator would significantly impair Karen's physical health or

11

emotional development. *Cf. Kushner v. Kushner*, No. 03-06-00634-CV, 2008 WL 615422, at *1–3 (Tex. App.—Austin Mar. 7, 2008, no pet.) (mem. op.) (holding that trial court did not abuse its discretion by denying motion to strike under section 102.004(b) when grandfather's petition alleged that mother was an alcoholic, had been intoxicated when caring for child, had exposed child to violent boyfriend, had lied during proceedings, and had child removed once by CPS).

Accordingly, we conclude and hold that Daphne alleged sufficient facts to show standing to intervene under section 102.004(b). We overrule Martha's first issue.

### Rule 11 Agreement

In her third issue, Martha contends that the trial court abused its discretion by entering an order incorporating the parties' rule 11 agreement because she validly withdrew her consent before the trial court rendered a final order.

A rule 11 settlement agreement is not binding if a party withdraws its consent before the trial court has rendered judgment unless the other party successfully sues to enforce the settlement agreement as a contract. *See Padilla*, 907 S.W.2d at 461–62; *Brooks v. Brooks*, 257 S.W.3d 418, 421–22 (Tex. App.—Fort Worth 2008, pet. denied); *see also* Tex. Civ. Prac. & Rem.

12

Code Ann. § 154.071(a) (Vernon 2005) (regarding settlement agreements entered into after mediation).[6] Once the trial court renders judgment based on a rule 11 settlement agreement, the parties cannot revoke their consent to the agreement. *Alcantar v. Okla. Nat'l Bank*, 47 S.W.3d 815, 821 (Tex. App.—Fort Worth 2001, no pet.).

Judgment is "rendered" when the trial court officially announces its decision on the matter submitted to it in open court or by written memorandum filed with the clerk. *S & A Rest. Corp. v. Leal*, 892 S.W.2d 855, 857 (Tex. 1995); *Cook v. Cook*, 243 S.W.3d 800, 801 (Tex. App.—Fort Worth 2007, no pet.); *Alcantar*, 47 S.W.3d at 821.[7]

> The rendition of the trial court's decision, whether in open court or by official document of the court, is the critical moment when the judgment becomes effective. The subsequent reduction of the rendered judgment to writing is typically carried out by the party favored by the judgment. The signature of the trial court upon the writing is merely a ministerial act of the court conforming to the provision of Rule 306a(2) of the Texas Rules of Civil Procedure which calls for "all judgments, decisions and orders of

---

[6] This was not a mediated settlement agreement under either section 6.602 or section 153.0071(c)–(e-1) of the family code. *See* Tex. Fam. Code Ann. § 6.602 (Vernon 2006), § 153.0071(c)–(e-1) (Vernon 2008).

[7] A judgment routinely goes through three stages: rendition, reduction to writing and judicial signing, and entry. *In re Bill Heard Chevrolet, Ltd.*, 209 S.W.3d 311, 314 n.5 (Tex. App.—Houston [1st Dist.] 2006, orig. proceeding); *Wittau v. Storie*, 145 S.W.3d 732, 735 (Tex. App.—Fort Worth 2004, no pet.); *Henry v. Cullum Cos.*, 891 S.W.2d 789, 792 (Tex. App.—Amarillo 1995, writ denied).

> any kind to be reduced to writing and signed by the trial judge with the date of signing stated therein." The trial judge's signature upon the written judgment does not affect or change the date of the rendition of the judgment. A judgment is "entered" when it is recorded in the minutes of the trial court by a purely ministerial act of the trial court's clerk, thereby providing enduring evidence of the judicial act.

*Henry v. Cullum Cos.*, 891 S.W.2d 789, 792 (Tex. App.—Amarillo 1995, writ denied) (citations omitted) (cited in *Alcantar*, 47 S.W.3d at 821 nn.28–29). Thus, the date a trial court signs a judgment controls subsequent new trial and appellate deadlines rather than determines when a judgment is rendered. *Alcantar*, 47 S.W.3d at 821; *Henry*, 891 S.W.2d at 792.

An intent to render judgment in the future does not equal rendition, however. *S & A Rest. Corp.*, 892 S.W.2d at 858; *Cook*, 243 S.W.3d at 801. The words spoken or written by the trial court must evince a present act that effectively decides the issues before the court. *S & A Rest. Corp.*, 892 S.W.2d at 858; *Cook*, 243 S.W.3d at 801. In other words, the trial court's words must "clearly indicate the intent to render judgment at the time the words are expressed." *S & A Rest. Corp.*, 892 S.W.2d at 858. But what the trial court believes to be the legal effect of its act is not dispositive. *Id*. ("The fact that

14

the trial court believed that he had rendered judgment during the May 14 hearing is not dispositive.").[8]

Here, the issues to be resolved by the trial court were conservatorship, child support, and other issues related to an original SAPCR, as well as Daphne's intervention seeking conservatorship or possession and access. The case was set for a final hearing the day the parties were questioned about and agreed to the settlement on the record in court. No issues were left open for resolution, and the trial court's language at the end of the hearing—"upon the testimony of all the parties involved, the court will approve the agreements as

---

[8] In *S & A Rest. Corp*., the trial court had asked the plaintiff whether she realized that once the judgment had been signed and the trial court approved it, then, at that point, everything was "full, final and complete" and she could not "come back later and say, 'Well I made a mistake,' or 'We should have gone for more.'" *Id*. at 857. Even though the trial court stated in the motion for new trial hearing, "I approved the settlement. I also rendered [j]udgment," the supreme court held that what the trial court believed was not dispositive because that belief was not reflected in the trial court's spoken words. *Id*. at 858. *But see Escobar v. Escobar*, 711 S.W.2d 230, 232 (Tex. 1986) (holding, in deciding whether judgment nunc pro tunc was proper, that "whether the court pronounced judgment orally and the terms of the pronouncement are questions of fact"); *Hernandez v. Lopez*, No. 01-06-00901-CV, 2009 WL 793635, at *4 (Tex. App.—Houston [1st Dist.] 2009, no pet.) (op. on reh'g) (same). Thus, it appears that the trial court, in making findings of fact regarding whether it rendered judgment orally, and if so what the terms of that judgment are, must rely solely on what the record reflects the trial court did and said, rather than the trial court's independent recollection of those facts. *See S & A Rest. Corp*., 892 S.W.2d at 858; *Escobar*, 711 S.W.2d at 232; *Hernandez*, 2009 WL 793635, at *4.

15

they have been stated for the record, and I will make it the written order of the court when it is submitted"—indicates a present intent to orally render judgment on the parties' agreement and an intent to sign a "written" memorialization of the present order at a later date. *See Patel v. Eagle Pass Pediatric Health Clinic, Inc.*, 985 S.W.2d 249, 251–52 (Tex. App.—Corpus Christi 1999, no pet.) (holding the following words showed a present intent to orally render judgment, "Settlement is approved and ordered. Mr. Rhodes, . . . you draft the order, circulate it, and let's have it within five working days."); *Arriaga v. Cavazos*, 880 S.W.2d 830, 832–33 (Tex. App.—San Antonio 1994, no writ) (holding the following sufficient to show present intent to orally render judgment: "[T]he *court will order* $4,259 payable no later than ten days.").

Our conclusion is further supported by the trial court's docket sheet entry for that day: "Final Hearing - Parties appeared w/ attys & testified; All matters agreed - Ct. approved agreements; Order to be presented." *See* Tex. Fam. Code Ann. § 101.026 (Vernon 2008); *Henry*, 891 S.W.2d at 793.

The facts in this case, including the actual words spoken by the trial court, distinguish it from *Cook*, 243 S.W.3d at 801–02, in which a majority of the panel held that the trial court did not indicate a present intent to render judgment when it stated that "[u]pon submission of the final decree and signed by the Court, the divorce will be granted at that time, not today." *But see*

16

*Cook*, 243 S.W.3d at 805 (Livingston, J., dissenting) (urging that trial court's approval of settlement agreement as "just and right" and statement that "agreement . . . is approved" had legal effect of granting divorce). Here, the trial court clearly distinguished between its oral rendition at the hearing and the need for a written memorialization of that order, stating, "I will make it the *written* order of the court when it is submitted." [Emphasis added.]

Accordingly, we conclude and hold that the trial court rendered a final order in the case on March 31, 2008 in open court, and, therefore, Martha did not timely withdraw her consent to the rule 11 settlement agreement. We overrule Martha's third issue.

In her second issue, Martha contends that the trial court abused its discretion by signing a final order giving Daphne a superior right of possession to Karen without proper pleadings or evidence under chapter 153, denying Martha her Fourteenth Amendment due process rights. She specifically cites sections 153.002, 153.432, and 153.433 of the family code.[9]

---

[9] Section 153.002 states that the trial court shall always make the child's best interest its primary consideration in determining issues of conservatorship and access. Tex. Fam. Code Ann. § 153.002 (Vernon 2008). Section 153.432 authorizes a grandparent to file either an original or modification suit for possession of or access to a grandchild, and section 153.433 *requires* the trial court to order grandparent access if the grandparent "overcomes the presumption that a parent acts in the best interest of the parent's child by proving by a preponderance of the evidence that denial of

17

To the extent that Martha's argument in her second issue is contingent on her contention that she validly withdrew her consent to the rule 11 agreement, we overrule her second issue for the reasons set forth above. To the extent that Martha's argument is based on her contention that Daphne did not overcome the chapter 153 presumption that a parent acts in his or her child's best interest, permitting a grandparent to obtain court-ordered access only upon a showing that denial of access will "significantly impair the child's physical health or emotional well-being," we hold that the issue was resolved by the settlement agreement. *See* Tex. Fam. Code Ann. §§ 153.007, 153.433 (Vernon 2008); *In re Derzapf*, 219 S.W.3d 327, 333 (Tex. 2007) (orig. proceeding).

The public policy of the State of Texas is that the best interest of the child is the primary consideration of the court in determining conservatorship issues. Tex. Fam. Code Ann. § 153.002 (Vernon 2008); *Garcia-Udall v. Udall*, 141 S.W.3d 323, 331 (Tex. App.—Dallas 2004, no pet.); *see In re C.A.P., Jr.*, 233 S.W.3d 896, 902 (Tex. App.—Fort Worth 2007, no pet.). An agreement on conservatorship issues that is not in the child's best interest violates public policy and is unenforceable. *Garcia-Udall*, 141 S.W.3d at 331 (citing *Leonard*

possession of or access to the child would significantly impair the child's physical health or emotional well-being." *Id*. §§ 153.432, 153.433.

18

*v. Lane*, 821 S.W.2d 275, 278 (Tex. App.—Houston [1st Dist.] 1991, writ denied); *Hill v. Hill*, 819 S.W.2d 570, 572 (Tex. App.—Dallas 1991, writ denied)).

> The trial court specifically found that
>
> possession of the Child by [Daphne] is in the best interest of the Child because as all parties involved, through their own free will and after being questioned by their respective attorneys in open court, created a Rule 11 Agreement in the presence of the Court by testifying that it was their desire to allow such possession because they felt it would be in the best interest of the Child. Said possession was not created nor forced upon the parties; rather, the Court accepted their testimony that the possession was in the best interest of the Child and concurred with their decision.

Martha does not challenge this finding; thus, it is binding on us unless the contrary is established as a matter of law or there is no evidence to support the finding. *See McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986); *Raman Chandler Props., L.C. v. Caldwell's Creek Homeowners Ass'n*, 178 S.W.3d 384, 390 (Tex. App.—Fort Worth 2005, pet. denied). Considering the parties' agreement and the policies set out in the family code, Martha has not made such a showing. We conclude and hold that the trial court did not abuse its discretion by approving the parties' settlement agreement and thus granting Daphne the possession and access agreed to by the parties. *See* Tex. Fam. Code Ann. § 153.007(a)–(b) (providing that parties may amicably settle conservatorship and possession disputes by agreement and that trial court shall

19

render order accordingly if agreement is in child's best interest). We overrule her second issue.

## Conformance of Final Order to Rule 11 Agreement

In her fourth issue, Martha complains that the final order is incomplete and does not strictly conform to the parties' agreement. When parties reach a settlement agreement, the judgment must conform to that agreement. *Chisholm v. Chisholm*, 209 S.W.3d 96, 98 (Tex. 2006); *Vickrey v. Am. Youth Camps, Inc*., 532 S.W.2d 292, 292 (Tex. 1976); *Tinney v. Willingham*, 897 S.W.2d 543, 544 (Tex. App.—Fort Worth 1995, no writ). Martha contends that the final order does not conform to the settlement agreement in numerous ways; we will examine each one in turn.

### Daphne's Attorney

Martha says that the final order reflects the wrong attorney for Daphne. But the attorney listed is the one who actually represented her at the March 31 hearing during which the parties testified to their settlement agreement, although her counsel has since changed. The inclusion of this attorney's name lends further support to our conclusion that the trial court rendered judgment orally on that date as that attorney was the one who argued at the "final hearing" rather than the subsequent motion to enforce hearing. Additionally, the presence of her attorney's name as of March 31, 2008 in the order

20

accurately reflects her representation as of that date as shown in the record.[10]

Martha also claims that the order inaccurately reflects that a jury was waived; however, at the time the order was rendered, the parties had waived a jury by entering into the agreed settlement and allowing the trial court to render judgment.[11] *See Solares v. Solares*, 232 S.W.3d 873, 882 (Tex. App.—Dallas 2007, no pet.); *Massey v. Galvan*, 822 S.W.2d 309, 318 (Tex. App.—Houston [14th Dist.] 1992, writ denied). Thus, we conclude that the final order is not nonconforming in these respects.

**Agreed Parenting Plan**

Martha contends that "[t]he Parenting Plan [referenced on page 2 of the order] was not agreed to by the parties on the Record or otherwise." This is in reference to the following statement in the order: "The Court finds that the provisions in these orders relating to conservatorship, possession of and access to the child, child support, and a dispute resolution process to minimize future disputes constitute the parties' agreed parenting plan."

---

[10] Moreover, even if the order did not accurately reflect Daphne's attorney's name, such an error would be clerical rather than judicial. *See McLendon v. McLendon*, 847 S.W.2d 601, 610 (Tex. App.—Dallas 1992, writ denied).

[11] Martha did not request a jury until after she attempted to withdraw her consent to the settlement agreement.

21

Family code section 153.007 provides that the parties to a dispute regarding conservatorship, or possession and access, or both, may amicably settle their disputes by entering into an agreed parenting plan, subject to the trial court's approval after considering the child's best interest. Tex. Fam. Code Ann. § 153.007; *Lane v. Hart*, 651 S.W.2d 419, 421 (Tex. App.—Eastland 1983, writ ref'd n.r.e.) (holding that oral agreement qualifies as agreed parenting plan under former version of section 153.007); *see McLendon v. McLendon*, 847 S.W.2d 601, 608 (Tex. App.—Dallas 1992, writ denied) (noting that rule 11 itself "equates a written agreement with the 'open court and entered of record' portion of [the] rule"). Here, the parties entered into a rule 11 settlement agreement on the record, disposing of all the conservatorship, possession, and access issues, which the trial court approved, finding that it was in Karen's best interest. Accordingly, we conclude and hold that this statement in the final order is in conformance with the parties' agreement and comports with section 153.007. *See* Tex. Fam. Code Ann. § 153.007(a), (b).

**Child's Residence Limited to Texas**

Martha contends that the following was not agreed to, on the record or otherwise:

22

The Court finds that, in accordance with section 153.001 of the Texas Family Code, it is the public policy of Texas to assure that children will have frequent and continuing contact with conservators who have shown the ability to act in the best interest of the child, to provide a safe, stable, and nonviolent environment for the child, and to encourage conservators to share in the rights and duties of raising the child. IT IS ORDERED that the primary residence of the child shall be the state of Texas, and the parties shall not remove the child from the state of Texas for the purpose of changing the primary residence of the child until modified by further order of the court of continuing jurisdiction or by written agreement signed by the parties and filed with the court.

It is unclear which part of this statement Martha challenges. However, as to the second sentence regarding residency, Peter agreed on the record that Martha would have the primary right to determine Karen's residence "*within the state of Texas*," and Martha testified that she agreed with "everything that's been said." [Emphasis added.] As to the first sentence, it merely restates the public policy of the State as to conservatorship issues and does not mention possession and access by nonconservators, such as Daphne is here. As such, it is difficult to ascertain how it conflicts with the parties' agreement at trial or how it could have caused an improper judgment. *See* Tex. R. App. P. 44.1(a)(1). We conclude and hold that this provision does not conflict with or impermissibly add to the parties' agreement.[12]

_____

[12] Martha also contends that the order erroneously states that Peter lives out of state, but this is simply a misreading of the language, which states that the geographical restriction will be lifted if, at any time Martha wants to

23

**Conservators Living 100 Miles or Less Apart**

Martha contends that the parties did not agree on the standard possession schedule for parties living 100 miles or less apart. We agree. Peter testified that the parties agreed that Peter will have standard possession for parents living over a hundred miles apart. Although both schedules are included in the order, the schedule for parents living less than 100 miles apart specifically says that it does not apply when Peter lives more than 100 miles away. It is undisputed that Peter lives in Houston, and Martha lives in the Metroplex area. Accordingly, we conclude and hold that this provision conforms to the parties' agreement.

**Daphne's Possession**

Martha claims that the parties never agreed that Daphne would have a superior right of possession to Karen, that she was to surrender Karen at either Peter's or Martha's house, depending on whose period of possession it was, or that Daphne was to have exclusive periods of possession.

The part of the order giving Daphne possession states as follows:

[Daphne] shall have a superior right of possession of the child as follows:

---

move out of state, Peter is then living out of state.

1.    Summer Possession by [Daphne] - [Daphne] shall have possession of the child for a period of two consecutive days of her choice during [Peter's] summer possession and a period of two consecutive days of her choice during [Martha's] summer possession, totaling a period of four days each year . . . .

2.    Surrender of Child by [Martha] and [Peter] - [Martha] and [Peter] are ORDERED to surrender the child to [Daphne] at the beginning of each period of [Daphne's] possession at their residence.

[3].    Return of Child by [Daphne] - [Daphne] is ORDERED to return the child to [Peter] and/or [Martha], if [Peter] or [Peter[13]] are entitled to possession of the child, at the end of each of [Daphne's] exclusive periods of possession, at their residence.

Peter testified that the parties agreed that Daphne would "exercise two of [his] 42 days in the summer for the purpose of her having a little bit of visitation" and that Martha would "be surrendering two of her days."  When asked if she understood that Daphne would "be exercising possession, two of those days coming out of [Martha's] summer possession and two days coming out of [Peter's] summer possession," Martha answered, "Yes."  Thus, Peter and Martha each agreed that they would surrender two of their days of possession to Daphne so that Daphne could exercise "possession" of Karen.  A person with rights to "possession of" a child may exercise possession and control of the

---

[13] This should reference Martha and is clearly a typo based on the rest of the sentence.  Although invited to do so by the trial court, Martha declined to file a motion asking the trial court to correct any nonjudicial errors in the final order.  *See McLendon*, 847 S.W.2d at 610.

25

child, to the exclusion of all other persons including the managing conservator, during periods of possession. *E.C., Jr. ex rel. Gonzales v. Graydon*, 28 S.W.3d 825, 831 (Tex. App.—Corpus Christi 2000, no pet.); *Hopkins v. Hopkins*, 853 S.W.2d 134, 137 (Tex. App.—Corpus Christi 1993, no writ). Moreover, the parties specifically agreed that Daphne would be allowed additional access during either parent's period of possession if that parent so consented.

Although there was some confusion at first as to whether Daphne would be allowed to travel with Karen by airplane, Daphne eventually testified that she understood that she would pick up and return Karen to the residence of the parent who was surrendering his or her period of possession. When Peter's counsel asked Daphne if she understood that she was "responsible for picking up [Karen] at - - in Flower Mound and dropping her off there as well," Martha's counsel interjected, "Or wherever she is." He did not object to the questions or Daphne's subsequent testimony that she was "fine with that," and it is clear on the record that the parties had agreed on this arrangement as well.

We conclude and hold that this part of the final order conforms with the parties' agreement.

**General Terms and Conditions**

Martha contends that the parties did not agree to the "General Terms and Conditions," which state that they apply to possession regardless of the

26

distance between the parties "[e]xcept as otherwise explicitly provided in this Standard Possession Order." But these conditions are statutorily- required parts of the standard possession order regardless of distance, and the parties agreed to the standard possession order for parents living more than 100 miles apart. *See* Tex. Fam. Code Ann. § 153.316 (Vernon 2008); *In re Lester*, 254 S.W.3d 663, 664 n.1 (Tex. App.—Beaumont 2008, orig. proceeding). Therefore, this provision does not conflict with the parties' agreement.

**Health Care Provisions**

Martha contends that the parties did not agree to the health care provisions on pages 18–26 of the final order. Our review of the order indicates that it contains the agreement that Peter testified to and Martha agreed with: that Peter would provide Karen's health care insurance and that any uninsured expenses would be split 50/50 between Peter and Martha. Martha does not explain how the provisions differ from the parties' agreement. *See* Tex. R. App. P. 38.1(i); *Shelton v. Sargent*, 144 S.W.3d 113, 119 (Tex. App.—Fort Worth 2004, pet. denied); *see also Haynes v. Haynes*, 180 S.W.3d 927, 930 (Tex. App.—Dallas 2006, no pet.) (explaining that provisions not explicitly agreed to in settlement agreement but that have the effect of carrying out the essential terms agreed upon do not impermissibly vary or add to settlement agreement).

**Miscellaneous Child Support Provisions**

Martha additionally challenges the miscellaneous child support provisions as conflicting. The child support provisions incorporate the statutory provisions of family code sections 154.006, 154.013, and 154.015 regarding the status of child support obligations upon an obligor's or obligee's death and upon marriage of the conservators. Tex. Fam. Code Ann. § § 154.006, 154.013, 154.015 (Vernon 2008). Nowhere in the parties' agreement do they purport to change the family code's provisions regarding child support obligations; rather, Peter testified that he was paying current child support of $165 per month and working down an arrearage of $100 per month, both of which he paid directly to the state disbursement unit, and that he wanted the court to suspend withholding because he was self-employed. Accordingly, we conclude and hold that the provisions of the final order incorporating the family code's requirements concerning termination and/or continuation of child support do not conflict with the parties' agreement.[14]

---

[14] Daphne concedes that the paragraph "No Credit for Informal Payments" is not included in any statutory provision. This paragraph requires Peter to pay child support in the manner required by the final order and does not give him credit for payment made directly to Martha or for money spent on Karen during his periods of possession. Not only does this provision not conflict with Peter's testimony that he paid child support directly to the state disbursement unit, it also has not been challenged by Peter and is clearly in Karen's best interest and to the benefit of Martha. Accordingly, we conclude

28

**Medical Notification Provisions**

Martha further contends that the provision (1) requiring the parents to give each other notice if Karen requires surgical intervention or hospitalization or both, (2) requiring them to sign any necessary HIPAA releases, and (3) requiring each of them to designate the other as a person to whom protected health care information may be disclosed is in conflict with the parties' agreement. Martha fails to explain how this provision fails to effectuate the parties' agreement regarding their joint managing conservatorship or Karen's best interest. *See* Tex. Fam. Code Ann. § 153.001(a)(3) (Vernon 2008) (providing that state's public policy is to "encourage parents to share in the rights and duties of raising their child after the parents have separated"); *Haynes*, 180 S.W.3d at 930. Thus, we conclude and hold that this provision does not impermissibly conflict with the rule 11 settlement agreement.

**Discharge from Discovery Retention Requirements**

Finally, Martha complains that the parties did not agree to the provision discharging them from retaining discovery under rule 191.4, which allows the trial court to so order. Tex. R. Civ. P. 191.4. We fail to see how this provision impermissibly alters or adds to the parties' agreement, especially considering

---

and hold that that portion of the order is likewise not in conflict with the parties' agreement. *See Haynes*, 180 S.W.3d at 930.

29

that Martha has not raised any discovery-related issues on appeal. *See Haynes*, 180 S.W.3d at 930.

**Miscellaneous**

Martha also includes argument in her brief that Peter's weekends of possession were changed from the second, fourth, and fifth weekends, as set forth in the agreed temporary orders, to the first, third, and fifth weekends as set forth in the standard possession order. *See* Tex. Fam. Code Ann. § 153.313 (Vernon 2008). However, Peter and Martha both specifically agreed to the standard possession order on the record; thus, the trial court did not err by rendering an order entitling Peter to possession on the first, third, and fifth weekends rather than the second, fourth, and fifth. *See id*.; *Alcantar*, 47 S.W.3d at 821.

Martha further complains that the order does not include provisions for Daphne to give any specified prior notice before exercising her possession. Because the parties did not agree on any such provision, we cannot conclude that the trial court abused its discretion by failing to include such a provision in the final order. We do note, however, that the entire tone of the trial court's order—as well as the provisions of the family code—urges and promotes cooperation between the parties and the amicable settlement of any disputes, with the paramount interest being the best interest of the child in the conduct

of all affairs; Daphne's voluntarily providing prior notice, although not required, would certainly be in keeping with the spirit of the final order incorporating the parties' agreement.  We overrule Martha's fourth issue.

### Conclusion

Having overruled Martha's four issues, we affirm the trial court's final order.

TERRIE LIVINGSTON
JUSTICE

PANEL:  LIVINGSTON, DAUPHINOT, and WALKER, JJ.

DELIVERED:  July 23, 2009