## In the Interest of Kasee Angele PRINGLE, A Child.

### No. 12–92–00291–CV.

Court of Appeals of Texas, Tyler.

Aug. 31, 1993.

---

Michael E. Jarrett, Tyler, for appellant.

R.L. Whitehead, Jr., Longview, for appellee.

Before RAMEY, C.J., and BILL BASS and HOLCOMB, JJ.

RAMEY, Chief Justice.

This is an appeal from the denial of a motion to modify the conservatorship of Kasee Angele Pringle ("Kasee"), the daughter of the Appellant, Lisa Hooker ("Hooker") and granddaughter of the Appellees, Donna and Don Pringle ("Pringles"), whose son,

Kevin, was Kasee's biologic father. At the initiation of this action, Hooker was Kasee's sole Managing Conservator and the Pringle's son, Kevin, having acknowledged paternity though never married to Hooker, was Possessory Conservator.[1] The Pringles sought here to have themselves named Kasee's Managing Conservators and Hooker's status reduced to that of Possessory Conservator. After a bench trial, the mother, Hooker, was removed as sole Managing Conservator but the court then appointed both Hooker and the Pringles Joint Managing Conservators of the child, with the specific rights, duties, privileges and powers of the respective parties detailed. Hooker appeals from the judgment, assigning ten points of error. We will reform the trial court order, and, as reformed, affirm it.

Hooker's first point of error asserts that the grandparents, the Pringles, were without standing to be appointed Kasee's sole managing conservators in this suit affecting the parent-child relationship. The suit was initiated by the filing of a Motion to Modify the decree that had been entered in the 1988 legitimation proceeding.

■ The question of standing is a threshold issue. TEX.FAM.CODE ANN. § 11.-03(b)(1) (Vernon Supp.1990)[2] *Von Behren v. Von Behren*, 800 S.W.2d 919, 923 (Tex. App.—San Antonio 1990, writ denied). The trial court should make its determination on the issue of standing first, before the merits of the dispute are determined. This pre-trial procedure is initiated by the conservator's filing a plea in abatement, motion to dismiss or special exception. Odonnell, Bob, *Grandparent/Step Parent Rights in Texas*, STATE BAR OF TEXAS, ADVANCED FAMILY LAW SEMINAR (August 1991) Z–4 (citing cases). In this

record, we are unable to find any proceeding initiated by Hooker to determine the issue of standing.[3] We indulge a liberal construction of pleadings and pre-trial procedures in suits affecting the parent-child relationship. *Brown v. Brown*, 521 S.W.2d 730, 732 (Tex. Civ.App.—Houston [14th Dist.] 1975, no writ). We will construe the issue of the grandparents' standing to be duly raised.

■ The Pringles' Motion to Modify Kasee's conservatorship was filed under the cause number in the court of continuing jurisdiction in which Hooker's managing conservatorship had been ordered in the 1988 legitimation hearing. Sections 14.08(a) and 11.-05(a). As non-parties to the 1988 conservatorship order, the Pringles were not authorized to file a Motion to Modify. Sections 14.08(a) and 11.03(f). For that reason, we will construe the Pringles' cause of action as a Petition for Further Remedy, which does not require the Petitioner to have been a party to the decree sought to be modified.

■ Section 11.07 describes the procedure for filing a petition for further remedy. Any person authorized to file an original suit affecting a parent-child relationship has standing to file such a petition. Section 11.03(e). Hooker contends that the Pringles did not plead that they had standing to bring this action. As stated, we will not be bound by pleading technicalities in this type of case.

Grandparents' standing to contest a conservatorship is warranted if there is satisfactory proof that the child's environment with the Managing Conservator parent presents a serious and immediate question concerning the welfare of the child. Section 11.03(b)(1).[4] The Supreme Court has held that the elements of seriousness and immediacy as draft-

1. Kevin Pringle, who at all times relevant to this action was imprisoned for unrelated offenses, took no part in this action other than filing a waiver of citation acknowledging his awareness of the action and agreeing that the cause could be conducted and decided with no further notice to him.

2. All subsequent statutory references to the Family Code are to TEX.FAM.CODE ANN. (Vernon 1983, 1986 or Vernon Supp.1990) unless otherwise shown.

3. The court-appointed medical experts' testimony was not available for presentation until the end of the trial on the merits. These doctors' opinions were highly relevant on the question of standing as well as on the merits of the case. This brings into question whether an earlier disposition of the standing issue was appropriate.

4. The alternate test for grandparent standing to file a petition for further remedy was not applicable here inasmuch as Hooker did not file, nor consent to the filing, of the petition. Section 11.03(b)(2).

ed in the statute require that the child be in imminent danger of physical or emotional harm and that immediate action is necessary to protect it. *McElreath v. Stewart*, 545 S.W.2d 955, 958 (Tex.1977). The trial court made no findings of fact or conclusions of law as to the seriousness and immediacy of any harm arising from Kasee's environment with her mother, Hooker, although the court's ruling implies that she found that the Pringles had standing to bring the suit.

■ The burden of proof on the issue of standing to initiate the suit is imposed upon the grandparent petitioners. The standard of proof is by a preponderance of the evidence generally applicable to civil cases in Texas. Section 11.15(a); *Von Behren v. Von Behren*, 800 S.W.2d at 921.

The claimed basis for the attempted removal of the conservator was presented and controverted by a number of lay witnesses. The Pringles' witnesses generally attempted to show that the grandparents had taken responsibility for Kasee's upbringing since earliest childhood. Donna Pringle testified that Kasee was an insecure, clinging child with a great deal of anxiety about being abandoned, a feeling heightened by Hooker's recurring failure to pick up Kasee at the agreed time. She said that certain alleged inappropriate behavior of a sexual nature led the Pringles to be concerned about the various men who frequented Hooker's home. It was uncontested that during the year prior to the filing of this action, Hooker, who was unmarried, had had sexual relationships with at least four men, and that these men sometimes spent the night with Hooker when Kasee was there. It was also uncontested that other men, at different times, spent the night at Hooker's residence, though she denied having any sexual relationship with those individuals. Other evidence offered by the Pringles suggested that Kasee was ill-groomed and ill-dressed and that Hooker had failed to give her adequate medical care for a chronic ear problem.

The critical testimony about the existence of emergency danger to Kasee of physical and emotional harm came from two court-appointed, expert witnesses, approved by the parties: Dr. Ron Jareb, a licensed psycholo-gist and Dr. Gail Burress, a licensed professional counselor. Dr. Jareb was directed to make psychological evaluations of Kasee, Hooker and the Pringles. Dr. Burress was appointed near the commencement of the trial to review Dr. Jareb's evaluations; she met with Dr. Jareb on the occasion of Kasee's last two interviews.

On the issue of whether Kasee was in imminent danger of physical or emotional harm and whether immediate action was necessary to protect her, Dr. Jareb testified:

- (In answer to the question, "... is it your testimony that home should be with Lisa Hooker? For Kasee?") I haven't found anything in terms of the degree of impairment that would make me recommend a change.

- (In answer to the question, "... a parent in a custody litigation or a managing conservatorship determination is to be appointed unless there's significant either physical or emotional impairment being created by that relationship, and you didn't find that.") That's right.

- Well, she's (Kasee's) a delightful little girl, she's animated, she's spontaneous, in fact she was that way throughout our entire history over that 5 or 6 sessions until the very last session when I think she had some confusion about what was going on ... She's bright, she was cooperative with me. Affectionate, she offered affection spontaneously, ... She was always well dressed, clean, appropriate, seemed to be well mannered, had fairly good social skills, she's capable of digging her heals in and being stubborn ... She was a delightful child ... (In answer to the question, "I said she's a happy, well adjusted, perhaps precocious 6 year old normal healthy child, would you agree with that basically?") Generally speaking, yes.

- (In answer to the question, "If they're [Kasee's school grades] almost excellent in every category doesn't that buttress or support your conclusion that Kasee is a happy, well adjusted normal young 6 year old?") Certainly.

● ... I had to check for some potential sexual abuse and there was none of that there.

● ... I didn't find enough pathology, emotional disturbance to recommend a change in the current custody arrangement in my contact with her ...

● (In answer to the question, "... but a stable environment at least today and beginning, I guess, in January of 1992, Lisa Hooker's environment has been stable, her home's been the same, her job's been the same, her life style has been consistent since her folks have aided and assisted her in acquiring a home. Correct?") That's what she tells me and that's what I believe, yes.

Dr. Jareb did not find Kasee free of psychological problems. "She's capable of over-responding emotionally which developmentally is really normal for a 6 year old." At the very last session Kasee was a little more detached, which Jareb attributed to her way of preparing for the end of the evaluation. With the passage of time, she has also developed a clinging response in some environments.

Dr. Burress, the other expert, opined relative to this issue of Kasee's immediate danger of physical or emotional harm:

● (In answer to the question, "Now then, basically, then the, the generalized recommendations that Dr. Jareb has made in this case, do you concur with those generalized recommendations?") Yes, I do."

● (In answer to the question, "Have you in the examination of the records, consultation with Dr. Jareb, review of the 2 sessions you've had with Kasee, found any evidence of significant emotional impairment, physical impairment of Kasee Pringle [sic] from the records and personal contacts you've had?) My answer is no."

● Kasee is a bright, pretty child. She's affectionate, she's creative, she takes easily to people. She's not a scared child, I don't see a lot of anger in her, I see a lot, she's also a little bit spoiled. She's been a little indulged. She's very head strong ... She's very bright. She's very quick and she's very loving. She's very open to things. To, to people, to new experiences ... She's not a traumatized child, she's not significantly impaired, she's very resilient, there are a lot of things that have happened in this little girl's 6 years and she has, she's gained by that.

■ The two court-appointed experts are thus in agreement that, despite some unremarkable personality imperfections, Kasee is a normal, non-traumatized six year old. We hold that the experts' findings and opinions establish that the Pringles have failed to discharge their burden of proving that Kasee is in imminent danger of physical or emotional harm or that immediate action is necessary to protect her from such harm. *McElreath*, 545 S.W.2d at 958; Section 11.03(b)(1). Therefore, under the controlling statutory law, the Pringles did not have standing to bring this suit to remove Hooker as Kasee's Sole Managing Conservator.[5] Hooker's first point of error is sustained.

Hooker's points of error two, three, four, five, six, seven, eight and nine pertain to various elements of the grandparents' cause of action to remove and replace the parent as Managing Conservator of her child. With our holding on the threshold issue that the Pringles did not have standing to bring this suit to remove the conservator, we do not reach nor address Hooker's points of error two through nine pertaining to the unreached merits of that cause of action.

The trial court, however, did make an additional finding:

satisfactory proof that "the order sought is necessary because the child's present environment presents a serious question concerning the child's physical health or welfare." Tex.H.B. 793, 73rd Leg. (1993). Though this amended standard would not, of course, apply to this action, our conclusions concerning the Pringles' standing to bring this action would not change.

---

5. Effective August 30, 1993, Section 11.03(b) of the Family Code was amended to change the standing requirement for original suits brought by grandparents affecting the parent-child relationship. Rather than requiring satisfactory proof that "the child's environment ... presents a serious and immediate question concerning the welfare of the child," the new standard requires

"8) In the event the court is in error in appointing the parties joint managing conservators, the visitation as set out in the Order Modifying Prior Order[6] is in the best interest of the child."

The Pringles did not plead for this additional access relief. The trial court considered the grandparents' reasonable access to the child to be an alternative ruling; again, we will not disallow relief on the basis of technical rules of pleading in this parent-child relationship case. Furthermore, Hooker has not challenged the above findings. There was some indication at trial that the Managing Conservator did not disagree with the Pringles' continuing visitation arrangement with Kasee. Hooker's interrogation of some of the witnesses, however, suggests that she favors a reduction in the Pringles' access. We will, therefore, consider the grandparents' visitation further.

■ Grandparent access is determined by different statutory authority than that by which the grandparents had sought to remove the Sole Managing Conservator. In 1983, the legislature provided an independent remedy for grandparent access: Section 14.03(e) together with the satisfaction of at least one of the subdivisions (1) to (6) of that paragraph (e). In addition, sec. 14.03(f) clarifies grandparental standing to sue for access. Sampson, John J., *Texas Family Code Symposium*, 21 TEX.TECH L.REV. 1344. The Pringles' standing to sue for access is satisfied herein by the filing of this action, which we have construed as a petition for further action. Sec. 14.03(f)(2).

■ On the merits, section 14.03(e) specifies a three-pronged test. The first prong requires that one of Kasee's parents be a natural parent of the child. Section 14.03(e). That prong is satisfied. The third prong announces six specific sets of facts, the existence of only one of which satisfies this aspect of the requirements. The first fact situation is:

(1) the grandparent seeking access to the child is a parent of a parent of the child

and that parent of the child has been incarcerated in jail or prison during the three-month period preceding the filing of the petition ... Section 14.03(e)(1).

This first fact situation is met here as the natural father had been incarcerated in the Gregg County jail for nearly a year before the filing of the Pringles' action.[7] The third prong of the section 14.03(e) test is satisfied.

The second prong requires that access to the grandparents must be in the best interest of the child. Section 14.03(e). Again, we look to the testimony of the court-appointed experts. Dr. Jareb opined:

● (In answer to the question: "Now, do you have an opinion as to whether or not denial of frequent contact between Kasee and the Pringles might significantly impair the emotional development of the child?") Yes, ...

● Given Kasee's history with the Pringles and how she's learned to count on them and the relationships that she's developed with them I think it would be severely injurious to her in the future if they didn't have frequent contact with her.

● I think she (Kasee) deserves and needs continued quality contact with Don and Donna Pringle.

● And she also needs some, something structured so she can continue to get the good care, the loving and all of the things that she's gotten from the Pringles on a regular basis. Given the history of her contact with them, you know, I'd advocate for something close to what existed in the past.

● (In answer to the question: "With reference to the specific wherein she talked about one weekend a month, do you agree with that assessment by her?") ... First the Pringles have had a parenting function and changing that is, and particularly changing that abruptly is going to have some disruptive effect on Kasee's feelings of well being and emotional security, as the litigation has.

---

6. Also denominated "Order on Motion to Modify in Suit Affecting the Parent Child Relationship".

7. The facts of this case comply with two other subsections of section 14.03(e), notably (2) and (6).

In generally agreeing with Dr. Jareb, Dr. Burress testified:

- (In answer to the question, "He [Dr. Jareb] says that Kasee needs contact with the Pringles, again, with all of the limitations, do you agree with that?") Yes.
- (In answer to the question, "Now then, basically, then the, the generalized recommendations that Dr. Jareb has made in this case, do you concur with those generalized recommendations?") Yes, I do.

Dr. Burress was of the further view that continuous daily visitation with the grandparents under the circumstances could perpetuate some of the existing conflict and might eventually be harmful to Kasee. The court's Order Modifying Prior Order does not provide for daily visitation. We hold that reasonable access for visitation is in the best interest of the minor. We hold that the three-prong test for the Pringles to seek reasonable access under Section 14.03(e) is satisfied.

We further hold that though evidence sufficiency is not directly challenged by a point of error, the court's finding of fact or conclusion of law number eight, on the alternative issue of grandparents' access is supported by the evidence. We also hold that the trial court's visitation provisions for the Pringles as specified in its Order on Motion to Modify in Suit Affecting the Parent Child Relationship is supported by the evidence.

Hooker's tenth point of error faults the trial court for failing to grant an award of attorneys fees. Reasonable attorneys fees may be taxed as costs in actions brought under the Family Code. Sec. 11.18. "The awarding of attorney's fees in suits to change custody ... is within the sound discretion of the trial court." *Laviage v. Laviage,* 647 S.W.2d 758, 761 (Tex.App.—Tyler, 1983, no writ). Since neither party entirely prevailed in this action there is no reason to disturb the trial court's decision to allow each party to bear its own attorney's fees.

The Order on Motion to Modify in Suit Affecting the Parent Child Relationship is reformed to reinstate Lisa Hooker as sole Managing Conservator of the child, Kasee Angele Pringle, and the Order as reformed, is **affirmed.**