In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-18-00305-CV
_____

IN THE INTEREST OF E.Y.H.

On Appeal from the 279th District Court
Jefferson County, Texas
Trial Cause No. F-222,832

MEMORANDUM OPINION

In this suit affecting the parent-child relationship ("SAPCR"), B.V. appeals from an Order Adjudicating Parentage.[1] The Order named T.H. as the father of E.Y.H. and sole managing conservator, and it named B.V. possessory conservator and granted her supervised visitation. B.V. raises two issues on appeal asserting: (1) the trial court erred in denying her request for a continuance after her trial counsel

---

[1] We identify the minor and any family members by an alias, in this case initials, to protect sensitive data. *See* Tex. R. App. P. 9.9(a)(3).

1

was allowed to withdraw, which required her to immediately proceed *pro se* at the jury trial; and (2) T.H. lacked standing as a parent of a child under Chapter 160 of the Texas Family Code for the reason that he was solely a sperm donor. We affirm the trial court's judgment.

## I. Background

B.V. and T.H. began a dating relationship, and after approximately a year of dating, they decided they would like to have children together. Unable to conceive naturally, the parties decided to try in vitro fertilization (IVF). They agreed to use T.H.'s sperm and a donor egg to optimize their chances of success. Finding the cost of IVF in the United States prohibitive, they travelled to a clinic in Matamoros, Mexico.

While still a couple, B.V. and T.H. underwent two unsuccessful IVF treatments. Shortly after they ended their relationship, B.V. contacted T.H. and asked for a ride to the bus stop because she needed to travel to Mexico. She informed T.H. that she was pregnant and traveling to the IVF clinic. B.V. ultimately miscarried, and T.H. told her not to use his sperm again. B.V. responded by advising him that none of his sperm was left.

B.V. did not contact T.H. again until July 2013, when she called and asked for a loan. T.H. sent B.V. the money she requested to her cousin's home in

2

Brownsville, Texas, where B.V. lived at the time. Thereafter, B.V.'s cousin called T.H. and told him B.V. was pregnant with his child. T.H. immediately traveled to see B.V. and began providing financial assistance so that B.V. could leave the home she lived in, which T.H. indicated "wasn't sanitary." B.V. was in the last trimester of her pregnancy, and T.H. traveled to see her every weekend. He also went to at least one medical appointment with her.

B.V. delivered E.Y.H. via c-section, and T.H. attended the birth. T.H. testified that he was excited and did not really doubt E.Y.H.'s paternity but did not immediately sign papers at the hospital acknowledging his paternity or allow hospital staff to list him on the birth certificate. He explained that given his difficulty trusting B.V. under the circumstances, he felt it prudent to obtain a DNA test. He did so, and it confirmed his paternity.

Once the hospital released B.V. to travel, they returned to T.H.'s apartment in Houston and lived together briefly. T.H. testified they attempted to make it work for E.Y.H. but were unsuccessful, and B.V. moved to Beaumont with E.Y.H. in early 2014. T.H. continued supporting B.V. financially during this period and visited E.Y.H. often.

In his testimony, T.H. described escalating disagreements with B.V., and one in particular in which she struck him repeatedly in front of E.Y.H. He testified that

3

after this incident, he determined he needed to formally file to establish his paternity and a custody arrangement. Initially, B.V. and T.H. agreed she would have E.Y.H. during the week, and he would have the child on the first, third, and fourth weekends of the month.

T.H. testified that unbeknownst to him at the time, B.V. took the child to the hospital repeatedly to be examined by a sexual assault nurse examiner (SANE). She also called Child Protective Services (CPS) and made allegations of abuse against him. T.H. testified that each of these CPS investigations "ruled out" sexual and physical abuse. After two SANE exams did not reveal any trauma, B.V. returned to the hospital again to have the child undergo a third SANE exam, which the hospital refused to do. The next Thursday when T.H. traveled to Beaumont to pick up the child for his scheduled possession period, B.V. refused to surrender E.Y.H. T.H. called the police, and he was advised to obtain a writ of attachment to force B.V. to surrender the child. While T.H. was at the courthouse, B.V. disappeared and did not appear again until the following Monday, when she was served with process at the bus stop near her home. When a constable executed the writ of attachment, B.V. ran back to her home. T.H. testified that police arrived, and he ultimately retrieved E.Y.H.

4

T.H. testified that a third CPS investigation "ruled out" any abuse. Following the incident with the writ of attachment and forced surrender of E.Y.H., T.H. sought and obtained temporary orders from the court, and E.Y.H. began living with him primarily. B.V. only had weekend access to the child.

The court required both parents to undergo psychological evaluations. During trial, T.H. was allowed to read a portion of B.V.'s psychological evaluation for the jury, in which the psychologist stated B.V. "seems confused in separating reality from fantasy and is at risk to display inappropriate behaviors which appear to constitute a chronic and pervasive source of adjustment difficulties for her."

Approximately one week before trial started, B.V. again refused to return E.Y.H. to T.H. following her period of possession. When T.H. arrived at the designated pick-up location at the scheduled time, B.V. was not there. T.H. testified he called police, who arrived and contacted B.V. via telephone. When police called her, B.V. informed them that she would not return E.Y.H. The trial court authorized a second writ of attachment on March 20, 2018, but T.H. could not locate B.V. to execute it.

When B.V. arrived at the court on the morning of trial on March 26, 2018, she did not have E.Y.H. with her. She also would not tell anyone where she had hidden

the child. The court ordered B.V. to have the child brought to the courthouse. B.V. complied with the court's order and had the child delivered to the courthouse.

Prior to the commencement of trial, the trial court heard B.V.'s counsel's second motion to withdraw. The motion to withdraw alleged that circumstances had arisen making it impossible for him to continue representing B.V., including her refusal to follow his advice and her repeated unfounded reports to C.P.S. of abuse by T.H. At the hearing on the motion to withdraw, counsel told the court it was impossible to represent B.V. and properly prepare for trial when she continued to deny T.H. access to the child. B.V. testified that counsel was an "excellent attorney," and she thanked him for "dealing with her limitation of the language." B.V. said she wanted counsel to continue representing her and if counsel wanted to withdraw, she wanted an opportunity to find someone to represent her.

The trial court granted the motion to withdraw but denied B.V.'s request for a continuance. The trial court explained "[t]he jury's set for today. Just because one of the parties has engaged in some action . . . which would result in postponing the trial is not grounds for . . . a continuance." B.V. said she wanted a jury trial, and the trial court allowed one of B.V.'s friends to act as an interpreter.

On March 27, 2018, before testimony began, the trial court explained on the record that the case had been originally set for trial on July 11, 2016. B.V.'s first

6

attorney filed a motion to withdraw, which the trial court granted, and the trial was postponed. The trial court noted that B.V.'s next attorney began representing her on July 13, 2016, and within two months, he filed a motion to withdraw, which the trial court denied. The trial court also noted that counsel's second motion to withdraw, which the trial court granted, was based on B.V.'s "misconduct." The trial date of March 26, 2018 was the fourth trial setting. Because B.V.'s "misconduct" resulted in her attorney's withdrawal, the trial court denied her motion for continuance and refused to reset the trial for a fifth time.[2]

The jury found that T.H. should be appointed sole managing conservator. The trial court subsequently entered an Order Adjudicating Parentage providing that T.H. is E.Y.H's father, naming T.H. as sole managing conservator, naming B.V. as possessory conservator and granting her supervised visitation.

## II. Analysis

### A. Standing

We first address the issue of standing. *In re Pringle*, 862 S.W.2d 722, 724 (Tex. App.—Tyler 1993, no writ). B.V. contends for the first time on appeal that T.H. lacked standing as a parent under Chapter 160 of the Texas Family Code and

---

[2] In granting the motion to withdraw, the misconduct the trial court found to have occurred was based on B.V.'s bad faith reporting of abuse to C.P.S., violations of temporary orders in refusing to surrender the child and secreting the child.

is merely a sperm donor. Subject matter jurisdiction is essential to a court's power to decide a case, and standing is a prerequisite to subject matter jurisdiction. *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 553–54 (Tex. 2000). The issue of standing can be raised at any time, because it is an element of subject matter jurisdiction. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 445 (Tex. 1993). B.V. argues that if T.H. is a "donor," then he lacks standing.

When a statute confers standing, the statute itself serves as the framework for our standing analysis. *See In re Sullivan*, 157 S.W.3d 911, 915 (Tex. App.—Houston [14th Dist.] 2005, orig. proceeding); *see also Stillwell v. Stillwell*, No. 03-17-00457-CV, 2018 WL 5024022, at *3 (Tex. App.—Austin Oct. 17, 2018, pet. denied) (mem. op.). Section 102.003 of the Texas Family Code is the provision governing general standing to file suit. *See* Tex. Fam. Code Ann. § 102.003. That provision provides that "a man alleging himself to be the father of a child filing in accordance with Chapter 160, subject to the limitations of that chapter, but not otherwise" may bring suit. *Id.* § 102.003(a)(8). Additionally, the Texas Family Code confers standing on "a man whose paternity of the child is to be adjudicated[.]" *See id.* § 160.602(a)(3).

Using principles of statutory construction, other appellate courts have determined that a man's status as a "donor" under the statute does not affect his standing. In *In re Sullivan*, our sister court in Houston addressed the issue of whether

8

a "donor" has standing under the Texas Family Code as a man "whose paternity is to be adjudicated." 157 S.W.3d at 919. That court determined that the way the statute is written "suggests that our lawmakers intended a sperm donor to have standing as a man 'whose paternity is to be adjudicated.'" *See id.* We agree with the conclusion and reasoning of the Fourteenth Court of Appeals, which used the Code Construction Act to arrive at its conclusion:

> Based on the language of the statute, the object sought to be obtained, the circumstances under which the statute was enacted, the legislative history, former statutory provisions, including laws on the same or similar subjects, and the consequences of the different constructions, we conclude that, at a minimum, section 160.602(3) confers standing on a man alleging himself to be the biological father of the child in question and seeking an adjudication that he is the father of that child. We further conclude that under the statute, as drafted, the issue of the man's status as a donor under section 160.702 is to be decided at the merits stage of the litigation rather than as part of the threshold issue of standing.

*Id.*; *see also* Tex. Gov't Code Ann. § 311.023.[3] The statute B.V. relies on to support her argument that a donor lacks standing states that "[a] donor is not a parent of a

---

[3] The San Antonio Court of Appeals disagreed with the conclusion of the Fourteenth Court of Appeals that the "status as a donor is irrelevant to the question of standing to establish parentage." *See In re H.C.S.*, 219 S.W.3d 33, 35–36 (Tex. App.—San Antonio 2006, no pet.). That opinion pointed out that "male donor" is expressly excluded from the definition of an "alleged father." *See id.*; *see also* Tex. Fam. Code Ann. § 101.0015(b)(3). We find that the San Antonio case to be factually distinguishable as the man alleging himself to be the father agreed to act as a donor for a woman who was in a same sex relationship with another woman. *See In re H.C.S.*, 219 S.W.3d at 34.

9

child conceived by means of assisted reproduction." *See* Tex. Fam. Code Ann. § 160.702. We do not agree that this provision negates standing. The express language of the statute simply says that a "donor" is not a "parent." However, we do not believe that the fact a donor may not be a parent is dispositive to the issue of standing. There are multiple categories of non-parents on whom the Texas Family Code confers standing. *See id.* § 102.003(a)(2)–(15), 160.602 (conferring standing on government agencies, a licensed child-placing agency, a person designated as a managing conservator, a foster parent, a relative of the child within the second degree of consanguinity, a man alleging himself to be a father, a prospective adoptive parent, and an intended parent).

Nonetheless, even if we assume a man's status as a "donor" negates standing, we disagree that T.H. was a "donor." The Texas Family Code defines "donor" as "an individual who provides eggs or sperm to a licensed physician to be used for assisted reproduction, regardless of whether the eggs or sperm are provided for consideration." Tex. Fam. Code Ann. § 160.102(6). However, "an unmarried man who, with the intent to be the father of the resulting child, provides sperm to be used for assisted reproduction by an unmarried woman, as provided by Section 160.7031" is specifically excluded from the definition of "donor." *See id.* § 160.102(6)(C).

10

Neither party disputes that B.V. and T.H. were unmarried, they willingly decided to conceive a child, and T.H. "with the intent to be the father of the resulting child, provide[d] sperm to be used for assisted reproduction." *See id.* B.V. states in her brief that the parties started a relationship and decided to conceive a child by assisted reproductive methods. "If an unmarried man, with the intent to be the father of a resulting child, provides sperm to a licensed physician and consents to the use of that sperm for assisted reproduction by an unmarried woman, he is the father of a resulting child." *Id.* § 160.7031(a). These factors make clear that T.H. falls outside the statutory definition of "donor." *See id.* 160.102(6).

B.V. specifically points to the statutory provision immediately following requiring that the "[c]onsent by an unmarried man, who intends to be the father of a resulting child in accordance with this section must be in a record signed by the man and the unmarried woman and kept by a licensed physician." *See id.* § 160.7031(b). The plain language of the provision requiring consent does not negate that a man who provides sperm under that section is a father. *See id.* We cannot make the leap that because a written consent is absent from the record, a man is a "donor" rather than a "father."[4] That is an evidentiary issue, and all other evidence in this case

---

[4] While documents are not present in the record, T.H. testified he signed certain paperwork in the physician's office pertaining to the use of his sperm.

11

points to T.H.'s intent to be E.Y.H.'s father. Specifically, the parties agreed that they wanted children, he traveled with B.V. to Mexico for the procedure, he provided financial assistance to B.V. without a court order, and DNA confirmed that T.H. is E.Y.H.'s biological father. B.V. permitted T.H. to be present at E.Y.H's birth, they resided with T.H. after E.Y.H's birth, she accepted financial assistance from him, and despite claiming in her affidavit to the contrary, T.H.'s conduct before and after the child's birth indicated he intended to be a father to E.Y.H. Both parties shared care, custody and control of E.Y.H. after the birth of the child, and it was not disputed that T.H. provided sperm with the intent to be the father of the resulting child so that with a donor egg, the couple could conceive a child. We overrule this issue.

## B. Motion for Continuance

In her first issue, B.V. contends the trial court abused its discretion by denying her request for a continuance after her attorney withdrew and by requiring her to proceed *pro se* at a jury trial that same day. On appeal, B.V. does not challenge the trial court's ruling on counsel's motion to withdraw; however, she based her verbal request for a continuance on the need to obtain new representation in the wake of his withdrawal.[5]

---

[5] Texas Rule of Procedure 251 requires a motion for continuance may only be granted for "sufficient cause" and supported by an affidavit. Tex. R. Civ. P. 251.

12

We review a trial court's ruling on a motion for continuance for a clear abuse of discretion. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 800 (Tex. 2002); *Villegas v. Carter*, 711 S.W.2d 624, 626 (Tex. 1986); *State v. Crank*, 666 S.W.2d 91, 94 (Tex. 1984). An abuse of discretion exists when a trial court "'reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law.'" *Marchand*, 83 S.W.3d at 800 (quoting *Johnson v. Fourth Court of Appeals*, 700 S.W.2d 916, 917 (Tex. 1985)). When the basis for the motion for continuance is the withdrawal of counsel, the movant must show the failure to be represented at trial was not due to their own fault or negligence. *Villegas*, 711 S.W.2d at 626; *Crank*, 666 S.W.2d at 94; *Ruiz v. Ruiz*, No. 02-14-00047-CV, 2014 WL 4458952, at *3 (Tex. App.—Fort Worth Sept. 4, 2014, pet. denied) (mem. op.). A trial court may consider the entire procedural history of the case when deciding a motion for continuance. *Qurashi v. Jabeen*, No.14-12-00858-CV, 2013 WL 2644182, at *3 (Tex. App.—Houston [14th Dist.] June 11, 2013, pet. denied) (mem. op.).

B.V. contends that "she was not afforded the opportunity to participate at trial in a meaningful manner in violation of [her] right to due process under the United

---

However, the trial court seemed to recognize this as a motion for continuance and did not base his ruling on her failure to follow rule 251.

States Constitution and the Texas Constitution." We disagree. As the Texas Supreme Court noted in response to the appellant's due process complaint in *Crank*,

> [t]he matter of continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process *even if the party . . . is compelled to defend without counsel*. Contrariwise, a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality. There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.

666 S.W.2d at 94–95 (quoting *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964) (internal citations omitted)). As noted above, Texas has long required that when a party bases a motion for continuance on counsel's withdrawal, the party must show that the lack of representation was not due to the party's own fault or negligence. *See id.* at 94. The record before us establishes that B.V. failed to do so.

While B.V. relies on *Villegas*, we find that case distinguishable. In *Villegas*, the Supreme Court's decision hinged on the fact that Villegas was not negligent or at fault in causing his attorney's withdrawal. 711 S.W.2d at 266. Such is not the case here. This case is analogous to *Hovious v. Hovious*, where the trial court allowed counsel to withdraw three days prior to a hearing because the wife provided the attorney a fraudulent divorce decree. 2-04-169-CV, 2005 WL 555219, at *1, 4 (Tex. App.—Fort Worth Mar. 10, 2005, pet. denied) (mem. op). The trial court then denied

14

the wife's request for a continuance. *See id*. at *3–4. The appellate court determined the evidence adduced at the hearing on the motion to withdraw supported the trial court's conclusion that the wife was at fault for causing her attorney's withdrawal. *Id.* at *4.

The motion to withdraw alleged that B.V. consistently refused to follow counsel's advice by reporting matters to CPS that the agency repeatedly found to be baseless.[6] Moreover, the record of the hearing on the motion to withdraw established that B.V. violated the trial court's temporary orders for possession and access to the child by refusing to return the child to T.H. approximately one week earlier, then secreted the child away. When B.V. failed to return the child and police contacted her, she told them she would not return the child. The record further established that when B.V. arrived at the hearing, she did not bring the child with her, and the trial court had to order her to have the child brought to the courtroom from an unknown location. The record showed B.V. engaged in similar conduct on at least one prior occasion, and the trial court had issued its second writ of attachment six days prior to this hearing. B.V.'s conduct, including repeated violations of the trial court's

---

[6] The record from the hearing on the withdrawal and continuance established this was counsel's second motion to withdraw from the case. Counsel filed the motion to withdraw and certified that he sent a copy to B.V. on March 20, 2018, the same day the trial court issued a second writ of attachment, and six days before the hearing.

15

orders and her refusal to follow counsel's advice led to counsel's withdrawal. The trial court had granted B.V. and her counsel continuances in the past. But, because B.V.'s misconduct in secreting the child and refusal to surrender the child at the proper times led to her counsel's withdrawal, the trial court explained it was the fourth trial setting, denied B.V's requested continuance, and ordered the case to go forward. Under the unique circumstances facing the trial court in the underlying case, we hold the trial court did not abuse its discretion in denying B.V.'s requested continuance as counsel's withdrawal was directly caused by B.V.'s actions. *See Villegas*, 711 S.W.2d at 626; *Crank*, 666 S.W.2d at 94; *Hovious*, 2005 WL 555219, at *4. We overrule B.V.'s first issue.

### III. Conclusion

We conclude T.H. had standing to file suit as a man whose paternity was to be adjudicated. *See* Tex. Fam. Code Ann. § 160.602(a)(3). We further conclude that the trial court did not abuse its discretion in denying B.V.'s requested continuance following her attorney's withdrawal caused by her misconduct. *See Villegas*, 711 S.W.2d at 626; *Crank*, 666 S.W.2d at 94; *Hovious*, 2005 WL 555219, at *4. We affirm the trial court's judgment.

AFFIRMED.

                                         _____

                                                CHARLES KREGER
                                                     Justice

Submitted on November 4, 2019
Opinion Delivered December 12, 2019

Before McKeithen, C.J., Kreger and Horton, JJ.